# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GALINA IVANOVNA SMOLNIAKOVA,
                    *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,
                    *Respondent.*

No. 03-71600

Agency No.
A72-401-421

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 6, 2004—Seattle, Washington

Filed September 7, 2005

Before: Dorothy W. Nelson, Stephen Reinhardt, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge D.W. Nelson

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Robert O. Wells, Jr., Mikkelborg, Broz, Wells & Fryer, PLLC, Seattle, Washington, for the petitioner.

Peter D. Keisler, Mark C. Walters, and Margaret Perry (on the briefs) and Jeffrey Bernstein (argued), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

D.W. NELSON, Circuit Judge:

Petitioner Galina Smolniakova, a native and citizen of Russia, seeks review of the order of the Board of Immigration Appeals ("BIA"), denying her requests for asylum, withholding of removal, and review of the termination of her conditional permanent resident status. The Immigration Judge ("IJ") dismissed Smolniakova's asylum claim based on findings that she lacked credibility, failed to establish past persecution on account of an enumerated ground, and did not have a well-founded fear of future persecution. The IJ denied Smolniakova's request to review the termination of her conditional resident status on the ground that Smolniakova had not met her "heavy burden" of proving that her marriage in 1993 to a United States citizen was genuine, and found her deportable. The IJ granted Smolniakova voluntary departure in lieu of removal. The BIA affirmed the decision without opinion.

We hold that substantial evidence does not support the IJ's adverse credibility finding in the asylum context and that Smolniakova is statutorily eligible for asylum. We remand for an exercise of discretion on Smolniakova's asylum claim and for a review of her claim of withholding of removal. We also reverse and remand the IJ's denial of Smolniakova's petition

for review of the termination of her conditional resident status. Accordingly, we reverse the IJ's holding that because Smolniakova's conditional resident status was validly terminated, she was deportable. The BIA is instructed to grant Smolniakova a new hearing in which she has a full and fair opportunity to establish her credibility in the qualifying marriage context. On remand, the IJ shall also determine whether the government has met its burden of establishing by a preponderance of the evidence that Smolniakova did not intend to establish a life together with Roberto Quitevis at the time of their marriage.

## I.    Factual and Procedural Background

### A.    Smolniakova's Experiences in Russia

Smolniakova, a 39-year-old woman, was born in Kaliningrad, formerly Konigsberg, a city on the Baltic coast. She is the daughter of a Jewish mother and a non-Jewish father.

In her asylum application, Smolniakova recounted numerous instances of harassment and discrimination on account of her Jewish identity, including anti-Semitic profanities scribbled on the walls of her apartment entryway, human feces smeared on her mailbox, fires set in her mailbox, and repeated slashings of her front door. While instances of harassment and discrimination do not themselves rise to the level of persecution for purposes of asylum, *Nagoulko v. INS*, 333 F.3d 1012, 1016-17 (9th Cir. 2003), in Smolniakova's case they were foreboding harbingers of things to come.

Before the IJ, Smolniakova testified that she lived in an environment that was not only inhospitable to Jews, but one in which practicing Judaism openly was very difficult. From 1988 to 1991, Smolniakova participated in a Jewish community organization that met secretly. Smolniakova testified that the Berenshteyns, close family friends of Smolniakova, were very active in the group. Smolniakova testified that one sum-

mer night in 1990 she received a call while with her sister, Regina, in their parents' apartment, where they both lived. The caller announced that Mr. and Mrs. Berenstheyn had been killed and warned that the same fate lay in store for the rest of the Jews in Kaliningrad. Smolniakova was horrified to learn the following morning, when the news first became public, that the Berenstheyns had indeed been brutally murdered. They were discovered bound in their home with numerous stab wounds. *See A Crime on Bankovsky Street* (translated Russian newspaper article reporting the murder), *reprinted in* the Administrative Record ("AR") at 1453. Smolniakova testified that while the authorities claimed to make solving the case a top priority, the case was never resolved. She also testified that the lead investigator in the case mysteriously disappeared a month after the murders. Yuliya Berenshteyn, the surviving daughter of the slain Berenshteyns, testified that since the murder of her parents, Tolik Payrkov, another member of their Jewish organization, had also been killed.

Smolniakova testified that in May 1991, after the Berenshteyns' murder, she was attacked by two men while walking home from a town celebration. The men grabbed her from the street and began to strangle her behind some bushes along the side of the road. She testified that one of the assailants whispered in her ear, "Jewish Bitch." The attackers dispersed when a witness, who heard the scuffle, yelled out and threatened to call the police. Smolniakova testified that the men slowly walked away, promising that they would be back and that she would not get away alive next time. Regina, who cared for Smolniakova after the attack and to whom both Smolniakova and the good Samaritan stranger recounted the assault, substantially corroborated her sister's testimony.

Smolniakova testified that one evening, six months after the attack, two men began pounding on her door, threatening to kill her if she did not let them in and referring to her home as a "Jewish snake nest." Smolniakova and Regina called the police, but they refused to help. Smolniakova and Regina

explained that when they called to report this and other incidents, the police were unresponsive and dismissive, even to the point of laughing at them.

In September 1991, Smolniakova married her Russian boyfriend of several years, Alexey. As soon as they were married, she moved in with him and his family in order to change her address. After a few weeks, Alexey, a seaman, left for a five-month assignment abroad. Shortly thereafter, Smolniakova was forced to return to live with her parents because she was no longer welcome in her in-laws' home. Smolniakova testified that Alexey's mother unabashedly expressed her displeasure at her son's choice of a wife, who she feared would taint her grandchildren with "Jewish blood." Soon after leaving her in-laws, Smolniakova obtained a six-month visitor's visa to the United States. She and her husband agreed that she would be safe there until Alexey returned and she could rejoin him, hopefully in Germany, where he had the prospect of permanent employment.

Smolniakova left Russia in early December 1991. She testified that her husband had still not called for her after four months, that her mother told her of rumors that he was seeing other women, and that she believed his disapproving mother had been "working on him." At this point, Smolniakova decided to seek political asylum in the United States.

Without the benefit of counsel, Smolniakova filled out an asylum application, which was filed with the Immigration and Naturalization Service ("INS")[1] on April 17, 1992. While the INS officer who interviewed Smolniakova deemed her credible, the Service sent her a letter of intent to deny asylum on October 15, 1992 for failure to meet the requirement of a well-founded fear of persecution on account of one of the five

---

[1]On March 1, 2003, the INS was abolished as an agency within the Department of Justice and its functions were transferred to the newly created Department of Homeland Security.

enumerated grounds. Her application was subsequently denied on March 11, 1993.

### B. Smolniakova's Marriage to an American Citizen

Around November 1992, Smolniakova enlisted Regina's help in divorcing Alexey. The divorce was finalized in February 1993. Smolniakova testified that she met her second husband, Roberto Quitevis, through a mutual friend, Richard White, at a New Year's party in December 1992. She testified that they dated for a few months until she confided in him about the denial of her asylum application and her pending appeal, and he, in turn, proposed because, according to Smolniakova, he expressed strong feelings for her and could not bear the thought of losing her. She testified that they began having sexual relations that evening and continued to do so over the course of their marriage, which began in June 1993. Quitevis filed an immediate relative visa on Smolniakova's behalf, which the INS approved, and on January 24, 1994, the INS granted Smolniakova two-year conditional permanent resident status as the spouse of a United States citizen.

Smolniakova returned to Russia in July 1994 for three months to tend to her gravely ill mother. This was the first of three such trips. Smolniakova testified that Quitevis came to resent her prolonged absence and was sullen and detached when she returned home. She testified that while they continued to have conjugal relations, he became emotionally withdrawn, "like a stranger to [her]." By the time of her next trip to Russia in December 1994, the marriage had deteriorated significantly. Regina testified that when her sister came home to Russia the second time, she was "blue," "very nervous," and had lost a lot of weight, and confided in her that Quitevis had begun to sleep elsewhere.

On June 1, 1995, the INS revoked Smolniakova's conditional resident status pursuant to Immigration and Nationality Act ("INA") § 216(b), 8 U.S.C. § 1186a(b), based on a find-

ing — the culmination of an investigation precipitated by an anonymous tip — that her marriage to Quitevis was a sham. Deportation proceedings commenced in December 1995.

In the deportation proceedings, Smolniakova introduced various pieces of documentary evidence, including wedding pictures, a joint tax return, a marriage certificate, checks from a joint checking account, joint phone bills, and a lease in both her and Quitevis' names. Sixteen witnesses submitted affidavits, declarations, letters, and testimony stating generally that Smolniakova and Quitevis had been married since the summer of 1993, that they had lived together as husband and wife, and that they had suffered some marital problems during the course of their relationship, culminating in their divorce in November 1995. The affidavits and testimony substantiate her claims that she and Quitevis cohabited, shopped together, had conjugal relations, entertained together, bought furniture together, commingled assets, and generally lived as husband and wife. *See* 8 C.F.R. § 216.4(a)(5) (enumerating these and other indicia of a good faith marriage).

Quitevis presented a markedly different story. He testified that Smolniakova had approached him through their mutual friend, Richard White, about a business proposition, offering to pay him $5,000 to marry her and help her secure permanent resident status. He explained that Smolniakova paid him between $500 and $1,000 up front in cash and then another $1,500 to $2,500 in subsequent installments. He testified that he had been at Smolniakova's apartment a few times in order to further the illusion that they were married, and even spent the night at her place on at least one occasion, although he denied that they ever had sexual relations. Richard White corroborated Quitevis' testimony.

Quitevis also introduced various pieces of documentary evidence, including copies of checks made out to his aunt, whose house he claimed to rent with a few friends, along with various bill payments written from checks with the same

address, ranging in dates from March to August 1994. Quitevis' close friend, Edgar Franada, testified that Quitevis had confided in him that he had entered into a "paper marriage" with a Russian woman named Galina. Franada never responded to INS counsel's question about when Quitevis actually confided this to him. Franada also testified that he lived with Quitevis, along with another roommate, in Quitevis' aunt's house from June 1993 to the end of 1994, a time period that spans the duration of Smolniakova's marriage to Quitevis.

At the time of her separation from Quitevis, Smolniakova began a relationship with Tony Roland, who accompanied her on her final visit to Russia in the summer of 1995. Roland and Smolniakova were wed in December 1995 and profess to be happily married.

On March 4, 1996, Roland filed a Form I-130 Petition for an Alien Relative visa on behalf of Smolniakova, which was denied based on the marriage-fraud bar for such petitions. *See* INA § 204(c)(1), 8 U.S.C. § 1154(c)(1). Smolniakova sought review of the INS's determination that her marriage to Quitevis was a sham pursuant to INA § 216(b)(2), 8 U.S.C. § 1186a(b)(2), and review of her asylum and withholding of removal claims. The IJ found Smolniakova incredible as to all claims and denied her petition in its entirety. On March 19, 2003, the BIA affirmed the decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4). Smolniakova timely appealed.

## II. Standard of Review

Whether Smolniakova married Quitevis in good faith is an intrinsically fact-specific question reviewed under the highly deferential substantial evidence standard. "Under this standard, we must affirm unless the evidence is so compelling that no reasonable fact-finder could fail to find the facts were as [Smolniakova] alleged." *Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004). We also review the BIA's decision as

to whether Smolniakova has established eligibility for asylum under the substantial evidence standard. *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000).

Where, as here, the BIA adopts the decision of the IJ and affirms without opinion, we review the decision of the IJ as the final agency determination under the substantial evidence standard set forth above. 8 C.F.R. § 1003.1(e)(4); *see also Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003).

Because Smolniakova was first placed in deportation proceedings before the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, and a final order of deportation was entered after October 30, 1996, her appeal is governed by the transitional rules of IIRIRA. *See Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997).

## III.   *Discussion*

### A.   *Asylum*

#### 1.   *The Adverse Credibility Determination*

**[1]** Adverse credibility determinations must be "based on specific, cogent reasons that bear a legitimate nexus to the finding." *Zahedi v. INS*, 222 F.3d 1157, 1165 (9th Cir. 2000); *see also de Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir. 1997). The inconsistencies that an IJ adduces to establish a lack of credibility must therefore be specific and concrete, and "must go to the heart of [the] asylum claim." *Singh v. Ashcroft*, 301 F.3d 1109, 1111 (9th Cir. 2002) (internal quotation omitted).

**[2]** The perceived contradictions that the IJ attributed to Smolniakova in support of her adverse credibility finding are based on a misconstruction of the record, insufficient evi-

dence and improper speculation and conjecture. *See Ge v. Ashcroft*, 367 F.3d 1121, 1124 (9th Cir. 2004) (stating that adverse credibility determinations cannot be justified by speculation or conjecture). Moreover, many of the putative inconsistencies fail to "go to the heart" of the asylum claim.

**[3]** In support of her adverse credibility finding, the IJ first pointed to discrepancies between Smolniakova's asylum application, completed without the assistance of counsel, and her testimony at the merits hearing. The IJ noted that "[r]espondent testified at the merits hearing that her wrist was slashed by a man, but yet respondent did not mention this in her asylum application." In her first asylum application, Smolniakova explained that she had been "mistreated and threatened a lot of times" and that she "want[ed] to specify one of the terrible incidents." This court has recognized that "an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application." *Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) (citing *Aguilera-Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990)). This court has also found that asylum forms "filled out by . . . people who . . . are unable to retain counsel" should be read charitably, especially when it comes to the absence of a comprehensive and thorough account of all past instances of persecution. *Aguilera-Cota*, 914 F.2d at 1382 ("Under these circumstances, the IJs cannot expect the answers provided in the applications to be as comprehensive or as thorough as they would be if set forth in a legal brief."). Smolniakova's asylum application is not inconsistent with her later, more detailed descriptions of persecution in Russia simply because she failed to describe all prior incidents of mistreatment and persecution in the early stages of her application process. Smolniakova's failure to file an application that was "not as complete as might be desired cannot, without more, serve as a basis for a finding of lack of credibility." *Lopez-Reyes*, 79 F.3d at 911 (internal quotation omitted).

Second, the IJ made much over what she claimed was an inconsistency between Smolniakova's and Regina's accounts

of the attempt on Smolniakova's life in May 1991. The IJ
pointed out that Smolniakova testified her assailants simply
walked away after a witness to the assault threatened to call
the police, whereas her sister testified they ran away. The IJ
failed to consider, however, that Regina, or perhaps the trans-
lator through whom she was speaking, immediately corrected
her testimony about the manner in which the attackers dis-
persed — "[they did] not exactly run away, just start to walk
away." Both Smolniakova and Regina, whose testimony the
IJ found "believable as a whole," testified, then, that the
attackers "walked away." The IJ found an inconsistency
where none exists. Moreover, this kind of judicial hair-
splitting does not go to the heart of the asylum claim. *See
Singh*, 301 F.3d at 1111-12. In contrast, the IJ did not cite any
material inconsistencies with respect to the various accounts
of the actual assault, or with respect to the repeated testimony
about anti-Semitic threats, including death threats and ethnic
slurs that others made to Smolniakova.

**[4]** Third, the IJ questioned the veracity of Smolniakova's
claim that she came to the United States seeking a safe haven
from the menacing conditions for Jews in Russia. The IJ's
efforts to discredit Smolniakova's stated reason for leaving
her homeland betray, at best, inattention to the record and, at
worst, outright bias against Smolniakova.

The IJ opined, "If respondent was afraid in Russia, she
could have gone with her husband, Alexey, to Germany."
Aside from being impermissibly speculative, the IJ's pro-
nouncement demonstrates a willful disregard of the facts in
the record. Smolniakova explained that Alexey was away at
sea for five months and that they both believed she should
leave Russia during that period to ensure her safety. Smol-
niakova testified that Alexey's permanent assignment in Ger-
many was only a "possibility" and that she planned to move
to Germany *if* Alexey received a permanent assignment there.
The IJ's opinion that Smolniakova would have gone to Ger-
many had she truly left Russia out of concern for her safety

is at best mere conjecture. "Because conjecture is not a substitute for substantial evidence, we cannot uphold this finding." *Lopez-Reyes*, 79 F.3d at 912; *see also Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002).

The IJ, by again grossly misconstruing the record, found incredible Smolniakova's claim that she intended to leave the United States and rejoin her husband when he returned from his deployment at sea. The IJ stated:

> Respondent also testified that she asked her sister to help her get a divorce in February, 1992, 2 months after her arrival to the United States. This fact further proves that respondent is not only not credible, respondent is lying to this Court as to her intention when she arrived in the United States. Respondent had no intention of returning to her Russian husband.

The record is plain; Smolniakova did not seek help from her sister in divorcing Alexey in February 1992, but rather in November 1992. She did not in fact divorce him until February 1993, a full 14 months after her arrival in this country. The IJ culled her damning "fact" about Smolniakova — viz., that she sought a divorce only two months after her arrival in this country — from the early part of a colloquy between Smolniakova and her lawyer, wherein they try to establish the date of Smolniakova's divorce from Alexey. Smolniakova tries to reconstruct the timeline based upon a mistaken recollection, and it becomes clear that the timeline is off by a year because of the mistake. When corrected on this point, Smolniakova clarifies that the divorce happened in February 1993, not February 1992. Even a cursory reading of the transcript makes this clear, and yet the IJ seized upon the obviously mistaken timeline initially proffered, and later corrected, by Smolniakova as fact to impugn her credibility.

The IJ also found that Regina's testimony that Smolniakova left Russia shortly after her marriage to Alexey in order to

escape persecution contradicts Smolniakova's own testimony that, according to the IJ, "she left Russia for a visit to the United States." The IJ again found a contradiction where none exists. Smolniakova testified that in order to obtain a visa for the United States she needed an invitation from people already in the country. That she was going to visit friends in the United States was thus the official reason for her trip, the true purpose of which, she testified, was to seek a safe haven for the five months in which Alexey was away at sea.

**[5]** The IJ concluded that this "entire scenario does not make any sense." She explained as follows:

> Respondent left Russia for the United States in December, 1991, three months after her marriage to her boyfriend of many years. Respondent got married 4 months after her purported incident of attack and rape. If respondent's reason for leaving Russia was fear, why did she get married within 4 months, and then leave 3 months later when her husband was out of town.

Far from "making no sense," it is perfectly reasonable that, faced with the prospect of living for an extended period with her parents — where she had been threatened and attacked several times before — and without the protection of her husband, Smolniakova would decide to seek safe haven in the United States. And, in fact, this is exactly what Smolniakova testified that she and Alexey agreed she would do for the five months he was away at sea. The IJ erred by not considering in a reasoned manner Smolniakova's explanation for what the IJ thought to be a nonsensical course of events. *Osorio v. INS*, 99 F.3d 928, 933 (9th Cir. 1996) (holding that the IJ "must address in a reasoned manner the explanations that [petitioner] offers for [any] perceived inconsistencies"). In sum, the IJ had no reason to find Smolniakova's explanation of why she came to the United States incredible.

Fourth, the IJ faulted Smolniakova for failing to provide corroborating evidence in support of her testimony. The IJ found that Smolniakova's credibility was undermined by her failure to corroborate her testimony about the May 1991 attack with a letter from the stranger who witnessed the assault. The IJ committed legal error in so finding. This court has held that "[s]upplying corroborating affidavits . . . has never been required to establish an applicant's credibility." *Lopez-Reyes*, 79 F.3d at 912 (citing *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984)). Furthermore, it is unreasonable to expect Smolniakova to have obtained a cor-roborating letter from an unidentified stranger.

The IJ also claimed that "respondent never offered any cor-roborating evidence to verify the death of the Berenshteyns." To the contrary, Smolniakova provided a copy of a newspaper article describing the incident, along with a translation, in her amended asylum application. This court has found that a newspaper article reporting an alleged incident of persecution offered in support of oral testimony is sufficient documentary evidence of such an incident. *See Aguilera-Cota*, 914 F.2d at 1382-83. The IJ clearly erred by finding that Smolniakova never offered corroborating evidence of the Berenstheyns' murder and by using this finding to impugn her credibility.

**[6]** In light of the foregoing, it is appropriate to echo the words of this court in *Paramasamy* and express a similar worry that "these passages demonstrate the IJ's 'predisposi-tion to discredit' the testimony, rather than any lack of credi-bility on the part of the witnesses." 295 F.3d at 1051 (quoting *Garrovillas v. INS*, 156 F.3d 1010, 1015 (9th Cir. 1998)). In *Paramasamy*, this court found that the IJ's adverse credibility finding was not supported by substantial evidence because, among other things, it relied upon "perceived inconsistencies not based on the evidence." *Paramasamy*, 295 F.3d at 1052. In this case, as in *Paramasamy*, "the facts as they appear in the record do not support the [IJ's] articulated basis for an adverse credibility determination." *Id*. That the IJ rebuked in

*Paramasamy* is the same IJ who presided over Smolniakova's asylum hearing is a fact not lost on this court.[2]

Because of the IJ's reliance on contradictions with no factual basis in the record, and in light of the many inconsistencies she unfairly imputes to Smolniakova, we reverse the IJ's adverse credibility finding with respect to the asylum claim, and accordingly "deem [Smolniakova's] testimony credible." *Akinmade v. INS*, 196 F.3d 951, 958 (9th Cir. 1999); *Aguilera-Cota*, 914 F.2d at 1383 (internal quotation marks omitted) (reversing the IJ's adverse credibility finding and holding that when, with the exception of minor omissions and other insignificant inconsistencies, there is an absence of evidence that undermines the petitioner's credibility, "we accept the testimony as true").

### 2. *Past Persecution on Account of Religion*

In addition to finding that Smolniakova was not credible, the IJ held, in the alternative, that Smolniakova was ineligible for asylum because she failed to establish either past persecution or a well-founded fear of future persecution on account

---

[2]In fact, the IJ in this case, Anna Ho, has been reversed by this court at least three times in the last year for reasons similar to those that compel our reversal here. Most recently, in *Zolotukhin v. Gonzales*, No. 04-70945, slip op. at 10004 (9th Cir. Aug. 3, 2005), we held that IJ Ho violated a Russian asylum applicant's due process right to a full and fair hearing because she "improperly prejudged the petitioner's case" and "excluded the testimony of several key witnesses." Just one year earlier, in *Rivera v. Ashcroft*, 387 F.3d 835, 1135 (9th Cir. 2004), *amended by* 394 F.3d 1129 (9th Cir. 2005), we held that IJ Ho failed "to conduct herself as an impartial judge but rather as a prosecutor anxious to pick holes in the petitioner's story." Moreover, in *Singh v. Gonzales*, 403 F.3d 1081, 1090 (9th Cir. 2005), this court reversed IJ Ho's adverse credibility finding in part because her "focus on minutely disparate dates" in the asylum applicants' testimony regarding seven-year-old events reflected "a flawed approach to credibility determination." Given this line of cases, we cannot help but question whether this IJ has, at least in some instances, improper hostility towards asylum applicants who appear before her.

of a qualifying ground. As a result, we need not remand to the BIA for a determination of these issues and we consider each in turn.

To establish eligibility for asylum, Smolniakova must qualify as a refugee. INA § 208(b), 8 U.S.C. § 1158(b). A refugee is one "who is unable or unwilling to return to . . . [her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). We hold that Smolniakova qualifies as a refugee and is statutorily eligible for asylum.

### a) Past Persecution

Asylum is not restricted to petitioners who have suffered persecution at the hands of state actors. *See Singh v. INS*, 134 F.3d 962, 967 n.9 (9th Cir. 1998); *see also Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (" 'Persecution' may be inflicted either by the government or by persons or organizations which the government is unable or unwilling to control.") (citation omitted). Taken as true, as it must be for purposes of this appeal, Smolniakova's testimony compels the conclusion that the government turned a blind eye to her persecution, refusing to intervene in any meaningful way to stop it. That her assailants who attacked her in May 1991 "slowly walked away" when a witness threatened to alert the police is consistent with this testimony; it suggests that Smolniakova's assailants recognized the acquiescence of the local authorities in this type of conduct and that the witness's threat was thus a hollow one. *See Krotova v. Gonzales*, No. 04-70806, slip op. 10085, 10098 (9th Cir. Aug. 4, 2005) (holding that the Russian government was "unwilling or unable to control the anti-Semitic groups responsible for [Jewish] Petitioner's mistreatment").

Smolniakova's account of the May 1991 assault alone compels a finding of past persecution. *See Montoya-Ulloa v. INS*,

79 F.3d 930, 931 (9th Cir. 1996) (holding that persecution for asylum purposes means "infliction of suffering or harm upon those who differ . . . in a way regarded as offensive"). The death threats she received immediately following the murder of the Berenshteyns, during the May 1991 assault, and at her apartment where her would-be attackers called her home a "Jewish snake nest," also amount to past persecution. Repeated death threats, especially when those threats occurred in conjunction with other forms of abuse, require a finding of past persecution. *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1134 (9th Cir. 2004) (finding past persecution when harm was "inflicted [on petitioner] on more than one occasion . . . , and where the physical abuse was combined with other incidents, such as detention and threats"); *see also Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000) ("[W]e have consistently held that death threats alone can constitute persecution."); *contrast Lim v. INS*, 224 F.3d 929, 933, 936 (9th Cir. 2000) (holding that death threats may be deemed hollow and bereft of "significant actual suffering or harm" and thus do not constitute past persecution where they are unaccompanied by infliction of actual abuse or harm upon petitioner or petitioner's family). Even if a single incident does not rise to the level of persecution, the cumulative effect of these several incidents constitutes persecution. *See Krotova*, slip op. at 10093 (holding that a "background of anti-Semitic harassment and economic and social discrimination against [Jewish Petitioner], and in Russia generally" combined with three violent assaults, the murder of a close family friend, and the beating of Petitioner's brother, all compelled a finding of past persecution).

### b) *On Account of Religion*

**[7]** The facts in the record compel the finding that Smolniakova was persecuted on account of her religion. The IJ's finding that there was no nexus between the asserted persecution and Smolniakova's religion is not supported by substantial evidence.

The IJ found that the May 1991 attempt on Smolniakova's life was not motivated by anti-Semitism. Given Smolniakova's and Regina's repeated testimony that Smolniakova's assailants called her a "Jewish bitch," it is difficult to understand how the IJ could assert that "[n]othing said by the young men would indicate that this attack had anything to do with respondent's ethnicity."

The IJ also extended this dismissive, and seemingly biased, attitude to her analysis of another incident described by Smolniakova. Smolniakova testified that one evening in November 1991 two men banged on her door and threatened to kill her. She described the incident thus: "[T]hey were saying something like you better open the door, otherwise we'll kill you. Which, you know, doesn't make much sense, but I remember that that's exactly how they were saying it . . . And, uh, and calling us . . . Jewish, uh, snake nest or something like that." The IJ interpreted this testimony as follows. "Respondent described an incident in November, 1991, wherein men threatened to have her open the door of the apartment. Respondent refused, and thus the men just left. Again, even if the men yelled, "Jewish snakes", this is not evidence that any harm would come to respondent." We cannot agree with the IJ's interpretation; indeed, one would expect that the reaction of any reasonable person who was the victim of such an episode would include a well-founded fear of future persecution on account of her religious identity.

Smolniakova's consistent and corroborated testimony that she was called a "Jewish bitch" by one of the assailants who attacked her in May 1991, that she was warned that she and all Jews in Kaliningrad would be murdered as the Berenstheyns were, and that her home was called a "Jewish snake nest" by those who threatened to kill her if she would not let them enter her apartment compels the conclusion that Smolniakova was persecuted on account of her religion. The IJ's finding to the contrary was not supported by substantial evidence.

### 3.  *Fear of Future Persecution*

In addition to finding that Smolniakova failed to show past persecution, the IJ concluded separately that Smolniakova failed to demonstrate a well-founded fear of future persecution. We review the decision to determine whether it was supported by substantial evidence. *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir. 2004). Because the IJ made a determination on the question of well-founded fear, we do not remand for further consideration. *Id.*; *see also Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004) (declining to remand for an analysis of changed country conditions because applicant established a well-founded fear without the benefit of the presumption).

**[8]** In order to demonstrate a fear of future persecution, Smolniakova's fear "must be both subjectively [genuine] and objectively reasonable." *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (alteration in original) (internal citations and quotation marks omitted). An alien satisfies the subjective component of the well-founded fear test by testifying credibly about his fear of future persecution. *Mamouzian*, 390 F.3d at 1136. Because we find that Smolniakova's testimony is credible, she satisfies the subjective portion of the test. *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998).

**[9]** Smolniakova's credible testimony also compels the conclusion that her fear is objectively well-founded. As Smolniakova testified, she suffered violent attacks and repeated death threats as a result of her Jewish identity. She was attacked and strangled by men calling her a "Jewish Bitch." On one occasion, an assailant slashed her wrist. Despite this evidence, the IJ found that Smolniakova's three trips back to Russia demonstrated there was no likelihood of future persecution. However, Smolniakova provided a reasonable explanation for the trips. Smolniakova testified that she went to Russia on those three occasions to take care of her dying mother, who was languishing in the hospital "like a corpse,"

and to help her family, which was ill-equipped to deal with the situation. Rather than belying her avowed fear of returning home, Smolniakova's trips served as a testament to her love for her mother, whom she went to great pains to visit despite the risk she bore in doing so. *See Karouni v. Gonzales*, 399 F.3d 1163, 1176 (9th Cir. 2005) (holding that asylum applicant's two return visits to Lebanon to see his dying parents did not constitute substantial evidence that his fear of persecution was not well-founded); *see also Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir. 1995) (reversing denial of asylum where the INS "fails to distinguish fortitude in the face of danger from absence of fear").[3]

The murder of Smolniakova's close family friends, the Berenshteyns, also supports a finding of well-founded fear of persecution. *See Zhang v. Gonzales*, 408 F.3d 1239, 1249 (9th Cir. 2005) (holding that "acts of violence committed against an applicant's friends or family can establish well-founded fear of persecution."). The IJ concluded that there was no evidence that the Berenshteyns' death caused problems for Smolniakova. However, on the night of their murder, Smolniakova received an anonymous phone call warning her that what happened to the Berenshteyns would happen to her. Moreover, after Smolniakova left Russia, Tolik Payrkov, another member of her Jewish organization, was killed. Smolniakova understandably fears the same fate would befall her if she returned to Russia. In light of these circumstances, no reasonable fact-finder could conclude that Smolniakova has less than a ten percent chance of future persecution in Russia on account of her religion. *See Al-Harbi v. INS*, 242 F.3d 882,

---

[3]The government's reliance on *Hakeem v. INS*, 273 F.3d 812, 817 (9th Cir. 2001), is inapposite because the court's consideration of the import of Hakeem's uneventful trips home was solely in the context of its review of Hakeem's claim of withholding of removal, which requires an applicant to show a greater likelihood of persecution than she must establish to be eligible for asylum. Moreover, as Smolniakova points out, the safety of her one family member remaining in Russia, her father, is not probative because he is not Jewish.

888 (9th Cir. 2001) (noting "even a ten percent chance of persecution may establish a well-founded fear"). We thus conclude that the IJ's finding that Smolniakova lacked a well-founded fear of future persecution is not supported by substantial evidence.

There is an alternative basis on which we may ground our well-founded fear holding. Even were Smolniakova otherwise unable to demonstrate a well-founded fear of persecution, the finding that she established past persecution entitles her to a presumption of well-founded fear. *See Korablina*, 158 F.3d at 1043; 8 C.F.R. § 1208.13(b)(1). The presumption shifts the burden of proof to the government to establish by a preponderance of the evidence that the presumption no longer controls. *Id*. The government may satisfy this burden by showing that there has been a "fundamental change in circumstances," such that Smolniakova no longer has a well-founded fear, or that Smolniakova could "avoid future persecution by relocating to another part of [Russia], and under all the circumstances, it would be reasonable to expect [her] to do so." 8 C.F.R. § 1208.13(b)(1)(i)-(ii); *see also Ochave v. INS*, 254 F.3d 859, 868 n.5 (9th Cir. 2001).

The Supreme Court has held that we cannot determine the issue of changed country conditions in the first instance. *INS v. Ventura*, 537 U.S. 12, 14 (2002). However, here, the IJ addressed the issue of changed circumstances. The relevant portion of the IJ's decision reads as follows: "This Court does not find that even if there had been past persecution, that there is any likelihood of future persecution. The country condition has changed substantially." Where the IJ reaches the issue of changed circumstances, we need not remand, *see Ali v. Ashcroft*, 394 F.3d 780, 788 (9th Cir. 2005), unless she fails to "make an individualized determination as to the effect of country conditions." *Lopez v. Ashcroft*, 366 F.3d 799, 806 (9th Cir. 2004). The IJ here made an individualized determination. In concluding that the "country condition has changed substantially," the IJ noted that Smolniakova's trip to Russia

with her new husband was proof that she was not afraid to return to Russia. In light of the limited evidence submitted by the government in rebuttal[4] — just two newspaper articles — it is not clear whether the IJ could have made her analysis more individualized. Because the agency has already brought "its expertise to bear upon the matter" and "evaluate[d] the evidence," *cf. INS v. Ventura*, 537 U.S. 12, 17 (2002) (per curiam), this case requires no further remand for the application of agency expertise or for agency evaluation. *See Ali v. Ashcroft*, 394 F.3d 780, 788 (9th Cir. 2005).

**[10]** We review the IJ's factual findings regarding changed country conditions for substantial evidence. *Lopez*, 366 F.3d at 805; *see also Gui v. INS*, 280 F.3d 1217, 1229 (9th Cir. 2002). The record does not support the IJ's conclusion that the government rebutted the presumption of well-founded fear. The government offered two newspaper articles into evidence in support of its assertion that Russia was no longer a country that posed a threat to Smolniakova. The only relevant article profiled a Rabbi who works to cultivate Jewish life in Moscow. Nothing in the article suggests that a Jewish refugee would no longer have reason to fear persecution if she returned to Russia. The article simply concludes that "[t]oday there are three Jewish day schools in Moscow. Emigration has stabilized and the approximately 2 million Russian Jews are

---

[4]We note that the extremely limited evidence of changed country conditions offered by the government in this case may constitute an alternate ground for not remanding on the issue of changed conditions. Where the INS offers no evidence concerning changed circumstances before the immigration judge, the BIA, or this court, we do not remand because "to provide the INS with another opportunity to present evidence of changed country conditions . . . would be exceptionally unfair." *Nuru v. Gonzales,* 404 F.3d 1207, 1228 (9th Cir. 2005) (quoting *Baballah*, 367 F.3d at 1078 n.11)*; see also Ndom v. Ashcroft*, 384 F.3d 743, 756 (9th Cir. 2004). Here, aside from the two articles presented to the IJ, the government did not assert changed country conditions in its memorandum on appeal to the BIA or in its brief to this court. Because we have concluded that remand is unnecessary for other reasons, we need not determine whether the scant evidence introduced amounts to "no evidence" under our *Nuru* rationale.

not only permitted to leave the country; but to retain their Russian citizenship." *U.S. Rabbi Cultivates Jewish Life in Russia*, Wash. Times, Aug. 24, 1996, at 13, *reprinted in* AR at 1017.[5] Moreover, a news article such as this is not authoritative. *Cf. Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002) (holding that generalized information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution). In addition, "[i]nformation about general changes in the country is insufficient for the government to overcome the presumption." *Lopez*, 366 F.3d at 805 (citing *Rios v. Ashcroft*, 287 F.3d 895, 901 (9th Cir.2002)).

Not only is the record bereft of any substantial evidence supporting the government's contention that Russia has changed, but Smolniakova, her sister and Yuliya Berenshteyn testified that the persecution of Jews in the Kalingrad area of Russia continues and has grown substantially worse in recent years due to the growing strength of anti-Semitic organizations such as the anti-Jewish party, Pamyat. Indeed, Smolniakova testified that she believed her attackers were members of Pamyat and pointed out in her brief to the BIA that the U.S. Department of State Russia Country Report on Human Rights Practices for 1997 states that "Jews continue to encounter societal discrimination, and government authorities have been criticized for insufficient action to counter it." None of this testimony was contradicted or disputed by the

---

[5]The other article detailed how the INS had cataloged the misuse of the Lautenberg amendment, which allows certain historically persecuted groups of the former Soviet Union, including Jews, to seek refugee status abroad. *See* 1989 amendment to 8 U.S.C. § 1157 (Lautenberg amendment). Notwithstanding that the Lautenberg amendment is not the law under which Smolniakova may seek asylum, the article in fact supports Smolniakova's position. *See Vast Soviet Refugee Fraud Detailed*, Wash. Times, Nov. 4, 1995, at A1, *reprinted in* AR at 1083 (" 'The irony is that there are *plenty* of cases from the former Soviet Union which could qualify [as persecuted refugees],' noted a top INS official in Moscow in December 1993.") (emphasis added).

government. The IJ's finding that Smolniakova's presumption of well-founded fear was rebutted is thus not supported by substantial evidence. Accordingly, the presumption of a well-founded fear of persecution stands and Smolniakova is eligible for asylum on this basis as well.

**[11]** We therefore hold that Smolniakova is statutorily eligible for asylum and remand to the BIA so that it may exercise its discretion whether to grant her that form of relief.

## B. *Withholding of removal*

**[12]** A finding of past persecution also gives rise to a presumption of withholding of removal. 8 C.F.R. § 1208.16(b)(1)(i); *Hoque v. Ashcroft*, 367 F.3d 1190, 1198 (9th Cir. 2004). Because of her finding on the asylum claim, however, the IJ did not consider Smolniakova's withholding claim in light of this presumption. We therefore remand Smolniakova's withholding of removal claim to the BIA so that it may consider this claim in light of the presumption. *See He v. Ashcroft*, 328 F.3d 593, 604, (9th Cir. 2003) (holding that petitioner was statutorily eligible for asylum, but that remand for consideration of withholding of removal claim was still required under *Ventura*).

## C. *Qualifying Marriage*

**[13]** Pursuant to INA § 216(b)(2), Smolniakova requested a removal proceeding to review the INS's determination that her marriage to Roberto Quitevis, a United States citizen, was a sham. Under INA § 216(b)(2), "the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence" that the qualifying marriage was improper. 8 U.S.C. § 1186a(b)(2). To dispose of the marriage fraud issue, the IJ merely concluded that "the evidence is not clear as to whether this was a fraudulent marriage" and went on to hold that "[t]he respondent has not met her 'heavy burden' of proving that she did not enter into this marriage solely for the pur-

pose of obtaining immigration benefits." In so holding, the IJ applied the wrong standard of proof to the wrong party. Imposing the heavy burden of clear and convincing evidence on Smolniakova likely affected the result, especially in light of the IJ's conclusion that the evidence of marriage fraud was not clear. This alone would be sufficient reason to reverse the denial of Smolniakova's petition for review of the termination of her conditional resident status and to remand to the BIA.

[14] We also note that the IJ's misguided, and at times seemingly biased, adverse credibility finding in the asylum context casts serious doubt on her analogous finding in the sham marriage context. The IJ's application of differing standards to assess the credibility of witnesses undermines her impartiality and suggests a " 'predisposition [selectively] to discredit' the testimony, rather than any lack of credibility on the part of the witnesses." *Paramasamy*, 295 F.3d at 1051.

Quitevis testified that his marriage to Smolniakova was never more than a mere business proposition — a way for a young college graduate in bad financial straits to make some easy money. And yet, he testified inconsistently about the first payment installment he allegedly received from Smolniakova. The IJ was forgiving of this inconsistency, explaining that "[a]lthough the amount of payment was not completely consistent, the testimony is consistent in that Mr. Quitevis was paid for marrying the respondent." The IJ was similarly forgiving of Quitevis' inability to provide consistent testimony regarding the date he first met Smolniakova. It is striking, however, that the IJ did not extend the same understanding to minor inconsistencies, including inconsistent dates, in Smolniakova's testimony and the testimony of those who were called on her behalf.

Although Smolniakova's claims were presented together at a single hearing, the asylum claim and the qualifying marriage claim are analytically distinct. The adverse credibility finding in the asylum context must not be allowed to "wash over the

[qualifying marriage] claim." *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001) (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)); *see also Taha v. Ashcroft*, 389 F.3d 800, 802 (9th Cir. 2004) (reversing the IJ's adverse credibility finding in the asylum context and citing *Kamalthas*, 251 F.3d at 1284, for the proposition that such a finding should not be allowed to "wash over" petitioner's Convention Against Torture claim). Where, as here, the IJ's adverse credibility finding in the asylum context betrays the IJ's bias against the petitioner, such a finding of necessity casts a suspicious cloud over the negative credibility determination made in reviewing whether petitioner's qualifying marriage was a sham.

**[15]** Indeed, the IJ explicitly acknowledges this "wash over" effect in her decision. When discussing the marriage claim, the IJ states, "[T]he totality of the respondent's evidence is so internally inconsistent, inconsistent with her asylum application and inconsistent between witnesses, that the Court cannot possibly believe the witness." We therefore hold that the IJ's numerous erroneous findings that Smolniakova was lying about her asylum claim tainted the IJ's view of her credibility with respect to the qualifying marriage claim. Accordingly, we reverse the IJ's credibility determinations in the qualifying marriage context and remand to the BIA with instructions to hold a new hearing to make fresh findings on this issue. *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005) (remanding for a new hearing "to ensure that Petitioner has a full and fair opportunity to establish her credibility"). We further direct the BIA not to return the case to IJ Anna Ho. *Id.*; *Perez-Lastor v. INS*, 208 F.3d 773, 782 (9th Cir. 2000).

## IV.   Conclusion

In sum, we reverse the IJ's adverse credibility finding in the asylum context and find that Smolniakova has suffered past persecution on account of her religion and has a well-founded fear of future persecution. We accordingly find

Smolniakova statutorily eligible for asylum. We remand for an exercise of discretion on Smolniakova's asylum claim and for further consideration of the withholding of removal claim in light of the presumption that now operates regarding her ability to show future threats to her life or freedom. We reverse the IJ's denial of Smolniakova's petition to review the INS's determination that her marriage to Quitevis was a sham. We remand to the BIA for a new hearing to make fresh credibility findings in the qualifying marriage context and for further review of the INS's termination of Smolniakova's conditional permanent resident status in light of the new credibility findings and in conjunction with an application of the appropriate burden of proof. The BIA is instructed not to remand the case to IJ Anna Ho.

**PETITION GRANTED, REVERSED AND REMANDED.**