**Haik MELKONYAN, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General, Respondent.**

No. 04–70464.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 2007.

Filed March 22, 2007.

Tallman, Circuit Judge, filed dissenting opinion.

Leon B. Hazany, Esq., Law Offices of Asherson, Klein & Darbinian, Beverly Hills, CA, for Petitioner.

CAC–District Counsel, Esq., Office of the District Counsel Department of Homeland Security, Los Angeles, CA, Ronald E. LeFevre, Chief Counsel, Office of the District Counsel Department of Homeland Security, San Francisco, CA, Maria Mlynar, U.S. Department of Justice, Ryan W. Bounds, Office of the Solicitor General Robert F. Kennedy, Washington, DC, for Respondent.

Before: REINHARDT and TALLMAN, Circuit Judges, and WILKEN *, District Judge.

* The Honorable Claudia Wilken, United States District Judge for the Northern District of

MEMORANDUM **

Haik Melkonyan, a native and citizen of Armenia, petitions for review of the Board of Immigration Appeals' ("BIA's") decision affirming the immigration judge's ("IJ's") deportation order. The BIA affirmed the IJ's finding that country conditions in Armenia have changed sufficiently that Melkonyan no longer has a well-founded fear of future persecution. It also affirmed the IJ's adverse credibility determination, but did not rely on all of the grounds listed by the IJ. Because the BIA discussed the adverse credibility determination but adopted much of the IJ's decision, we review both decisions. *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir.2000).

■ We agree with Melkonyan that the changed country conditions determination is not supported by substantial evidence.[1] Where, as here, the petitioner has established past persecution, there is a presumption of eligibility for asylum, including a presumption of a well-founded fear of future persecution. *Ali v. Ashcroft*, 394 F.3d 780, 788 (9th Cir.2005). The government bears the burden of rebutting the presumption. *Id.* One way it can do so is with a showing of changed country conditions. *Id.* We have "repeatedly found that the DHS has not rebutted the presumption of a well-founded fear of persecution when evidence in country reports indicates that persecution similar to that experienced by the petitioner still exists." *Id.* at 789. Here, the country conditions reports state that the same type of persecution suffered by Melkonyan, unlawful detention accompanied by physical abuse, continues in

Armenia. Accordingly, as in *Ali*, the government has not demonstrated that country conditions have changed.

■ The BIA held that, notwithstanding the fact that the type of persecution experienced by Melkonyan still occurs in Armenia, the dissolution of the ANM and election of President Kocharian was sufficient to rebut Melkonyan's well-founded fear of future persecution. However, under *Mamouzian v. Ashcroft*, 390 F.3d 1129 (9th Cir.2004), the relevant question is whether persecution of the type suffered by Melkonyan continues, not whether the particular regime remains in power. In that case, we held that an individual who, like Melkonyan, was persecuted by the ANM continued to have a well-founded fear of persecution because the State Department reports stated that detention and abuse, like that suffered by the petitioner, continued in Armenia. We reached this conclusion without discussing the fate of the ANM, even though the country conditions report on which the BIA relied in *Mamouzian* stated that the ANM-supported president had been "forced to resign" and "most of the ANM members had deserted the party." U.S. Dept. of State, *Armenia Country Report on Human Rights Practices for 1998* at 1.

The State Department reports before us contain descriptions of detention and physical abuse that are virtually identical to those before the BIA in *Mamouzian*. As we explained in that case, unlawful detention and abuse remain common in Armenia. Political changes are of minimal im-

California, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

1. Although Melkonyan listed the changed country conditions issue among the issues in his opening brief and referred to that issue in

his conclusion, we need not decide whether that discussion would be adequate under our cases, *e.g.*, *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1136 (9th Cir.2004), as the government briefed the issue and, thus, suffers no prejudice as a result of our reaching it. *Ndom v. Ashcroft*, 384 F.3d 743, 751 (9th Cir.2004).

portance, particularly as the testimony and reports show that many former ANM members continue to hold positions of power. Thus, the BIA's determination that Melkonyan no longer suffers a well-founded fear of persecution is not supported by substantial evidence.

In addition to the evidence relied on by the BIA, the dissent relies on evidence of general improvements in the areas of free speech, free association, prison monitoring, and official accountability. However, "[i]nformation about general changes in the country is not sufficient." *See Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir.2001) (quoting *Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir.1998)). Moreover, the BIA did not consider these changes and failed to conduct any individualized analysis of how they would affect Melkonyan. *See Borja v. INS*, 175 F.3d 732, 738 (9th Cir.1999) (en banc) (requiring the BIA to conduct individualized analysis as a matter of law). The changes described by the dissent, when considered in the context of the country reports as a whole, merely support the conclusion that, although the "tide of violence may be receding, based on this record it still exists." *Id.* Thus, were we to consider the improvements discussed by the dissent, the record would still compel the conclusion that the government has not carried its burden of showing that Melkonyan no longer experiences a well-founded fear of future persecution. *See id.*

■ We also agree with Melkonyan that the adverse credibility determination was not based on substantial evidence. The IJ relied on the fact that Melkonyan stated that he was widowed in his asylum application, although he testified that he was divorced. This cannot be the basis for an adverse credibility determination because Melkonyan was not asked about the discrepancy at the hearing and thus was not given the opportunity to explain it. *Guo v. Ashcroft*, 361 F.3d 1194, 1200 (9th Cir. 2004). Moreover, neither this discrepancy nor Melkonyan's willingness to enter into a fraudulent marriage can be the basis for an adverse credibility determination as the marriage did not enhance his claims of persecution and, thus, did not go to the heart of his asylum claim. *See Wang v. Ashcroft*, 341 F.3d 1015, 1022 (9th Cir. 2003); *Marcos v. Gonzales*, 410 F.3d 1112, 1117–18 (9th Cir.2005).

The IJ also supported the adverse credibility determination with several instances in which he found that Melkonyan's testimony was vague and non-responsive. However, there is no support for any of these conclusions in the record. The IJ stated that Melkonyan was "evasive" regarding the nature of his marriage when, in fact, Melkonyan forthrightly volunteered that he had entered into the marriage solely for the purpose of obtaining a visa. The IJ did not point to a single question regarding the marriage that Melkonyan failed to answer directly. Nor was there any inconsistency in Melkonyan's statement that he got married in the hospital. To the contrary, this was consistent with his other statements regarding his haste to leave Armenia and the timing of his departure. The IJ also erred by finding that Melkonyan failed to answer a question that he was never asked: "What part of your body was injured?"[2] The inconsistency noted by the IJ regarding whether Melkonyan "went to the DA" is likewise illusory because a person may say that he "went" to a legal body when he raises a claim with that body even though

---

**2.** Melkonyan was asked, by his own attorney, "What were you treated for in the hospital?"

His testimony was directly responsive to that question.

he does not physically travel there.[3] Finally, the IJ found that Melkonyan was not sufficiently specific regarding his job with the party. However, Melkonyan's answer that he was "doing paperwork" and "working with a lot of documents" is at least as specific as "preparing documents" and "organizing people," answers the IJ suggested would have been acceptable. In light of the above, we conclude that the IJ's determination that Melkonyan's testimony was vague and non-responsive was not supported by sufficiently cogent reasons. *Aguilera–Cota v. INS*, 914 F.2d 1375, 1381–82 (9th Cir.1990).

Thus, we grant the petition, reverse the BIA's determination as to changed country conditions and credibility, and remand to the BIA for further proceedings consistent with this decision.

GRANT and REMAND.

TALLMAN, Circuit Judge, dissenting:

I agree with my colleagues that the IJ's adverse credibility determination cannot stand because it does not comport with our case law holding that an alien must be afforded an opportunity to explain any inconsistencies underlying that determination. But the IJ's denial of Melkonyan's claim for asylum was not based solely upon a finding of incredibility. The IJ held that, "even if [the alien's testimony] were reliable and if inconsistencies could be found to be slight or due to translation, . . . there has been changed circumstances [in Armenia]." This alternative rationale for rejecting Melkonyan's claim was (a) not challenged on appeal and, (b) even it were, is supported by substantial evidence. For these reasons, I respectfully dissent.

Melkonyan failed to challenge the IJ's finding that conditions in Armenia have changed such that he no longer has a well-founded fear of persecution. *See* 8 C.F.R. § 1208.13(b)(1)(i). Petitioner concedes that he "did not devote [his] Opening Brief to an intricately detailed argument regarding changed conditions." Indeed, not a single sentence in the argument section of his brief addresses changed country conditions. The failure to address (or even allude to) the IJ's finding of changed country conditions in the argument portion of his brief constitutes a waiver of the issue, and we cannot address the finding on appeal. *See* Fed. R.App. P. 28(a)(9)(A) (providing that a petitioner's brief must include an "argument, which must contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Acosta–Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir.1992) ("Issues raised in a brief which are not supported by argument are deemed abandoned.") (quoting *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988)); *see also Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir.1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); *Meehan v. County of L.A.*, 856 F.2d 102, 105 n. 1 (9th Cir.1988) (deeming an issue abandoned due to the party's failure to brief it). We have confirmed that, in the immigration context, an alien does not preserve a claim where the alien references an issue in his opening brief—and even indicates that he will present argument on the subject—but does not discuss the claim in the argument section. *See Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir.2006);

---

3. We also note that the interpreter had difficulty translating both from English to Armenian and from Armenian to English. Although it is not necessary to support our decision, we recognize that there is a strong possibility that the testimony relied upon in reaching the adverse credibility finding was not precisely translated.

*Martinez–Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir.1996) (holding that the petitioner's failure to address an issue in the argument portion of his opening brief waived the issue).

The majority asserts that "we need not decide whether [petitioner's discussion of changed circumstances] would be adequate under our cases, *e.g., Mamouzian v. Ashcroft*, 390 F.3d 1129, 1136 (9th Cir.2004), as the government briefed the issue and, thus, suffers no prejudice as a result of our reaching it."D I disagree. The only "briefing" of whether the record supports the IJ's finding of changed circumstances appears in four sentences of one footnote in the government's 30–page brief. Because "[t]he issue has not been fully explored" by the government, *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir.1990), we should hold the issue waived.

But, even if one were inclined to excuse Melkonyan's failure to challenge the IJ's finding of changed country conditions, substantial evidence in this record supports the IJ's finding. *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1052 (9th Cir.2005) ("We review the IJ's factual findings regarding changed country conditions for substantial evidence."). The IJ cited two pieces of evidence in support of his determination of changed country conditions: (1) the president of the National Public Organization (the political organization of which Melkonyan was a member), Mr. Manoukian, had indicated support for the new government of Armenia, and (2) the ANM (the governmental party which petitioner alleges was persecuting him) is no longer in existence. Both of these findings enjoy support in the record.

Melkonyan testified that Mr. Manoukian "is the president of National Public Organization" and that he is a supporter of the current regime in Armenia. In addition, the 1998 State Department Country Report confirms that the ANM dissolved in 1997. The country reports indicate that Levon Ter–Petrossian, the former leader of the ANM, resigned under pressure as President of Armenia in February 1998. Prime Minister Robert Kocharian was named acting President and then was elected President in March 1998.

The record includes additional support for the IJ's finding of changed country conditions. After his election, President Kocharian appointed a prominent opposition politician to head a human rights commission within the President's office. The commission has had a modest impact in prompting authorities to review official actions on social issues including police behavior. The 2001 country report details a number of successful prosecutions of government officials. A June 2001 amnesty resulted in the release of nearly 1,250 prisoners. The government permits human rights NGOs to visit prisons. The 2001 country report notes that the government generally respects freedom of speech, there is no official censorship, and opposition press regularly criticizes government policies and leaders—including the President—on sensitive issues. The government generally respects freedom of assembly and routinely grants permits for demonstrations and marches. The 2001 report also states that several domestic and international human rights groups operate without governmental restrictions and investigate and publish their findings on human rights cases.

In addition, the 1998 country report notes that, while human rights conditions have recently improved, "more serious indications of prejudicial treatment of opposition groups appeared in the run up to the July 1995 parliamentary elections" due in part to "the consolidation of political power by President Ter–Petrossian and his ruling Armenian National Movement." This pas-

sage suggests that, while human rights conditions may have been poor when Melkonyan lived in Armenia, they are indeed better now.

My colleagues find that "the country conditions reports state that the same type of persecution suffered by Melkonyan, unlawful detention accompanied by physical abuse, continues in Armenia." But that is not the standard that we are charged to employ on review—rather we must determine whether the record *compels* a finding that country conditions have not changed such that Melkonyan would risk persecution if he returned to Armenia. *See Smolniakova,* 422 F.3d at 1052. Because substantial evidence supports the IJ's finding of changed conditions to rebut that threat as to him, I must respectfully dissent.