**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEQA AHMAD HAJI ALI; MADAAR
A. OSMAN; ISACK A. OSMAN,
*Petitioners,*

v.

JOHN ASHCROFT, Attorney General,
*Respondent.*

No. 03-71731

Agency Nos.
A75-261-421
A75-261-420
A75-261-419

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 7, 2004—Seattle, Washington

Filed January 19, 2005

Before: Dorothy W. Nelson, Sidney R. Thomas,
Circuit Judges, and David A. Ezra,* District Judge.

Opinion by Judge D.W. Nelson

---

*The Honorable David A. Ezra, Chief Judge for the United States District Court, District of Hawaii, sitting by designation.

**COUNSEL**

Richard L. Baum (on the briefs) and Christopher L. Garrett (argued), Perkins Coie, LLP, Portland, Oregon, for the petitioners.

Frances McLaughlin (argued) and Blair T. O'Connor (on the brief), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

D.W. NELSON, Circuit Judge:

Deqa Ahmad Haji Ali petitions on behalf of herself and her two sons, Madaar Osman and Isack Osman, for review of the Board of Immigration Appeals' ("BIA") denial of their requests for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] Ali, Madaar, and Isack are all natives of Somalia. The Immigration Judge ("IJ") dismissed Ali's asylum claim based on findings that: (1) she had failed to establish that her past persecution was on account of an enumerated ground; and (2) that Ali and her sons had firmly resettled in Ethiopia prior to entering the United States. The IJ granted Ali and her two sons voluntary departure to Somalia in lieu of removal. The BIA affirmed the decision of the IJ without opinion. We find Ali statutorily eligible for asylum and remand for an exercise of discretion on the asylum claim and for further consideration of the withholding of removal claims.

---

[1] Madaar's and Isack's asylum applications are derivative of their mother's application because they were both under age 21 at the time of application. The sons, however, have applied for withholding of removal and relief under the CAT in their own right because such relief may not be derivative. *Compare* 8 U.S.C. § 1158(b)(3) (allowing derivative asylum for spouses and children as defined in 8 U.S.C. § 1101(b)(1)(A), (B), (C), (D), or (E)), *and* 8 C.F.R. § 1208.21, *with* 8 U.S.C. § 1231(b)(3) (failing to provide derivative withholding of removal).

## I.  Factual and Procedural History

### A.  Ali's Experiences in Somalia

Ali, the lead petitioner, was born in Berbera, a northern Somali city, and is a member of the Muuse Diriiye clan, which is referred to pejoratively as the Midgan clan. Muuse Diriiye clan members are bound in servitude to noble Somali families and are considered low-caste and subhuman by other Somali clans. As a result, higher-status clans will not marry members of the Muuse Diriiye clan. *See* 1996 Bureau of Democracy, Human Rights and Labor, U.S. Dep't. of State, *Somalia: Profile of Asylum and Country Conditions* 13, reprinted in Administrative Record (AR) at 637 (hereinafter *State Dep't Report*). Traditionally, the Muuse Diriiye had no rights to engage in political activities or undertake political work, but under the presidency of Mohammed Siad Barre they were allowed to assume political positions for the first time. *See id.* at 13-14, reprinted in AR at 637-38. This opening of civil service positions to a non-noble clan angered higher-status clans, including members of the United Somali Congress ("USC") militia that ousted Siad Barre in a civil war in 1991. *Id.* at 14, reprinted in AR at 638. The civil war between Siad Barre's forces and the USC spread to Mogadishu in January 1991 and Siad Barre fled Somalia, causing a period of clan warfare that has raged for over 13 years.

At the time of her flight from Somalia, Ali lived with her husband, Ahmed Omar Osman, in the capital city of Mogadishu. Osman, also a member of the Muuse Diriiye clan, worked for the Ministry of Education under the administration of President Mohammed Siad Barre. In early January 1991, six armed members of the USC militia broke into Ali's home around sunrise. Ali recognized one of the intruders as a neighbor who knew that Ali's husband worked for Siad Barre. Ali was brutally gang-raped by three of these armed men while her husband and brother-in-law were bound and forced to watch. While they were raping Ali, the persecutors called Ali

and her family "Midgans traitor" [sic] and told her she was "getting what [she] deserved" because she and her family were Muuse Diriiye, who were not supposed to advance in society, while the militia, members of higher-class clans, "were supposed to have everything." One of the men held Ali down with his shoes while raping her, which Ali testified was a sign of disrespect for her low-caste clan status. When Ali's brother-in-law cursed and spit on the militia for raping her, he was shot dead in front of her.

The militia also looted Ali's home, taking everything of value and destroying her household decorations. After raping Ali, the militia took her husband with them and said "let Siad Barre save you now . . . We came back to our country, you Midgan you have everything, but now we are in power and Siad Barre is gone." Ali's two sons, age eight and nine at the time, were in another room of the family home during these brutal rapes and murder. Afterwards, Ali and her sons fled to a neighbor's home.

Osman was released from detention by the militia after two weeks but came home with broken ribs and wrists. Upon his release, Ali, Osman, and their sons immediately fled to Ethiopia. Once in Ethiopia, Ali testified that Osman divorced her as a result of the rapes and the fact that afterwards he no longer saw her as a wife.

Ali's life in Ethiopia remained difficult. Although Ethiopia ran refugee camps for Somalis, Ali feared her family would be killed if they sought refuge in those camps either because of their clan membership or her husband's political affiliation with Siad Barre. The refugee camps near Ali's family were controlled by the Issaq clan, which engaged in warfare with Ali's clan and helped overthrow Siad Barre's administration. Her fear of death or persecution in the refugee camps also kept Ali from applying for any type of legal status in Ethiopia, which she feared would trigger being forcibly sent to a camp.

Ali testified that, although certain Somali refugees in Ethiopia could obtain permanent residence in Ethiopia because their clans were higher caste and had an established presence in Ethiopia, her clan, the Muuse Diriiye, could not. Ali also testified that the Ethiopian government never offered her any assistance or legal status. During the five-plus years Ali and her sons spent in Ethiopia as undocumented aliens, Ali testified that they "were trying to get out from there anytime, as soon as possible . . . [because] we didn't have any legal status, we couldn't work there, we couldn't go to school in there. And we couldn't plan—we didn't have a home in there so it was transition."

Despite her lack of work authorization, Ali was able to find under-the-table work as a "housemaid." Her first two employers, however, exploited Ali's lack of status by refusing to pay for her contracted services and threatening to report her to Ethiopian authorities when she protested. Eventually Ali found work as a maid for a family that paid her and worked for this family for nearly four years. However, during this time, Ali often discussed her desire to leave Ethiopia with her employer, created strategies to depart, and saved money for this purpose. Ali never moved freely about her city of residence in Ethiopia because she "was afraid that . . . someday the villa or the police of the government might arrest me and send me to the refugee camp."

When her employer decided to move to France, Ali and her sons arranged to come to the United States because they could not get the documents necessary to enter France with her employer's family. Although Ali's sons had lived only with their father and Ali's former husband, Osman, in Ethiopia, Ali and Osman agreed that the sons should accompany Ali to the United States. Osman believed his sons "live[d] a prison life" in Ethiopia and told Ali that he "support[ed] [Ali] to take them wherever they can get safe, they can be safe." After Ali and her sons left Ethiopia, Ali testified that Osman was arrested and jailed "[b]ecause he didn't have documents," but

was later released because an Ethiopian woman, whom he subsequently married, intervened on his behalf.

Ali and her sons entered the United States without inspection on November 21, 1996. On January 22, 1997, Ali applied for asylum. Her asylum application was denied and the Immigration and Naturalization Service ("INS") issued Ali a Notice to Appear on October 1, 1998.

## B.   The Asylum Hearing

After two merits hearings, the IJ issued an oral decision on August 2, 2000 denying Ali's petitions for asylum, withholding of removal, and relief under the CAT. Despite his positive credibility determination of Ali's testimony, the IJ found that Ali failed to establish asylum eligibility because she failed to establish past persecution on account of a protected basis. Instead, the IJ found that the sole motivation for the murder, detention, and robbery that Ali and her family suffered "was shown to clearly be simply to steal, and in the case of the rape to take gratification from the helpless condition of the respondent." In the alternative, the IJ denied asylum for Ali and her sons based on a finding that they were firmly resettled in Ethiopia before entering the United States because Ali "chose not to live in refugee camps" and "was never bothered by the authorities." The IJ also denied withholding of removal and relief under the CAT for Ali and her sons. The IJ did grant Ali and her sons' request for voluntary departure in lieu of removal, designating Somalia as the country of removal.

On September 1, 2000, Ali timely appealed these denials to the BIA on behalf of herself and her two sons. The BIA affirmed the IJ without opinion on March 27, 2003. Ali then timely filed this petition for review.

## II.   Standard of Review

We review the BIA's decision on whether the petitioner has established eligibility for asylum under the substantial evi-

dence standard. *Njuguna v. Ashcroft*, 374 F.3d 765, 769 (9th Cir. 2004). This standard limits reversals of BIA decisions to situations where the "Petitioner presented evidence 'so compelling that no reasonable factfinder could [fail to] find' that Petitioner has not established eligibility for asylum." *Singh v. INS*, 134 F.3d 962, 966 (9th Cir. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992)). As the BIA affirmed without opinion under 8 C.F.R. § 1003.1(e)(a), we review the IJ's decision as the final agency determination. *Lopez-Alvarado v. Ashcroft*, 371 F.3d 1111, 1114 (9th Cir. 2004). "We accept the Petitioner['s] testimony as true when, as here, the IJ found [her] to be credible." *Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004).

## III.   Discussion

### A.   The Asylum Claim

To establish eligibility for asylum, the applicant must first show that she qualifies as a refugee. Immigration and Nationality Act ("INA") § 208(b), 8 U.S.C. § 1158(b) (giving the Attorney General discretion to grant asylum to any alien deemed a "refugee"). A refugee is one "who is unable or unwilling to return to . . . [her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). We hold that Ali has met the statutory eligibility for asylum.

### 1.   Ali Suffered Past Persecution on Account of Political Opinion and Membership in a Particular Social Group

[1] Although the USC militia was not the ruling government in Somalia, its actions against Ali can appropriately be considered persecution. "Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute some-

one." *See Singh*, 134 F.3d at 967 n.9. We have also held that groups seeking to overthrow a government can be non-state agents of persecution for asylum purposes. *Arteaga v. INS*, 836 F.2d 1227, 1231 (9th Cir. 1988). The USC was involved in the overthrow of the Siad Barre administration, and therefore, can be considered a non-state actor capable of persecution.

[2] The IJ found that Ali was not persecuted on account of one of the five statutory grounds. We disagree. The persecution Ali suffered was clearly on account of the political opinion her persecutors believed she held and on account of her membership in a particular social group, her clan. We have repeatedly held that asylum applicants bear neither the unreasonable burden of establishing the exact motives of their persecutors nor the burden of showing that their persecutors were motivated *solely* "on account of" one of the protected grounds. *See, e.g.*, *Borja v. INS*, 175 F.3d 732, 735 (9th Cir. 1999) (en banc) (citing a second circuit holding that "the plain meaning of the phrase 'persecution on account of [a protected ground]' does not mean persecution *solely* on account of [that ground]"). Instead, we find that the necessary nexus exists "even when the persecutor acts out of mixed motives." *See, Mihalev v. Ashcroft*, 388 F.3d 722, 727 (9th Cir. 2004) (citing *Navas v. INS*, 217 F.3d 646, 656 (9th Cir. 2000)).

In his opinion, the IJ acknowledges mixed motive theory as the circuit law, but then holds Ali to a higher standard by concluding that "[d]uring a period of rampant thievery and lawlessness minority groups had no one to protect them. But this does not mean that the attackers wished to harm Ali's family simply because they belong to a minority group." The law, however, only requires Ali to show that the militia was motived *in part* by her clan status or political opinion.[2]

---

[2]The IJ considers, but ultimately rejects, Ali's claim that her persecution was on account of her clan membership. In contrast, the IJ does not discuss whether Ali proved past persecution on account of her political opinion because he wrongly reasons that membership in a particular social group is "the only protected ground that the Court can conclude applies."

To conclude that the persecution Ali and her family suffered was not on account of a protected ground, the IJ takes two conceptual steps. First, the IJ focuses nearly singularly, and inappropriately, on the burglary that occurred and de-emphasizes the contemporaneous rapes of Ali, the murder of her brother-in-law, and the arbitrary detention and abuse in custody of her husband. Second, the IJ views any connection between the persecution Ali suffered and her clan membership as limited to the fact that her clan status made her family a wise target for burglary. In his opinion, the IJ concludes:

> that the motivation [of the militia] was to steal any and all valuables from anyone that they could, and the minority clans were not able to defend themselves. Thus, [Ali's family was] not being attacked because they were members of minority clans, they were being attacked because the attackers wanted to steal all of their valuables, and the fact that they were minority members made the attackers feel that they could get away with the attacks without fear of reprisal.

The IJ also provides the following separate explanation for the militia's motivations to gang-rape Ali: "to take gratification from the helpless condition of the respondent."[3]

[3] Contrary to the IJ's characterization of the rapes and burglary, the attackers' words themselves evidence that they were motivated, at least in part, by Ali's clan status and political opinion, and not solely by criminal opportunism. While gang-raping Ali, the militia members contemporaneously declared that Ali was "getting what [she] deserve[d]" because she was a Midgan. During the attack, rapes, and murder the

---

[3]The IJ mistakenly stated that Ali was subjected to only one rape. Ali testified, however, that she suffered brutal gang-rapes by three militia members. *Compare* AR at 17 (IJ discussing only "the case of the rape") with id. at 168-69 (Ali's testimony of the gang-rapes.).

militia also taunted the family as "Midgans traitors." The attackers' tormenting last words to Ali and her family were "let Siad Barre save you now," and they proclaimed "now we are in power" as they took Ali's husband away. Combined, these statements make evident that at least part of the motivation for the rapes, murder, and arbitrary detention was the clan membership of the Ali family and the political opinion that the militia attributed to them based on Osman's employment by the Siad Barre administration.[4] *See Mihalev*, 388 F.3d at 727 (holding that "police officers' contemporaneous declarations that Gypsies did not deserve to live" while arresting petitioner and beating individuals present at the time of his arrest established past persecution on account of a protected ground); *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004) (holding that soldiers' statement that rape was because of petitioner's family's position in prior Ethiopian government was sufficient to establish proof of motivation).

In addition, at least one militia member was Ali's neighbor and knew Ali's family well enough to be aware that her husband worked for Siad Barre. This fact further supports the conclusion that the persecutors were motivated by Ali's political opinion. The IJ, however, fails to mention this evidence, which is relevant to our analysis of the underlying motivation for the persecution. *See Ochave v. INS*, 254 F.3d 859, 866 (9th Cir. 2001) (noting "in cases in which this court has found that rapes occurred 'on account of' an imputed political opinion, the evidence was clear that the rapists (1) knew the specific identity of their victims; and (2) imputed political opinions to those victims").

**[4]** Lastly, the IJ reasons that the persecution Ali's family suffered amounted to nothing more than "acts of random vio-

---

[4]This circuit has held that persecution of a political figure's employees and their families is persecution on account of political opinion even when the nature of the work is itself not political. *Cordon-Garcia v. INS*, 204 F.3d 985, 991-92 (9th Cir. 2000).

lence" of the sort that any member of the "general population" may have reason to fear during a period of civil war and, therefore, was not on account of a protected ground and fell short of past persecution.[5] The record, however, tells a different story. The militia members, which included Ali's neighbor, likely knew where they were going the morning they broke into Ali's home. The militia's own statements show that they knew not only of Ali's clan membership, but also of her relationship to the Siad Barre administration, and were motivated by both facts. We hold that the record compels any reasonable factfinder to find that the militia members were motivated — at least in part — by Ali's clan membership and political opinion. Therefore, Ali suffered past persecution on account of a protected ground.

[5] The IJ's ill-informed conception of the crime of rape and its use as a method of persecution may explain his failure to find that Ali suffered past persecution. We have repeatedly held that rape rises to the level of persecution. *See, e.g., Lopez-Galarza v. INS*, 99 F.3d 954, 959 (9th Cir. 1996); *Lazo-Majano v. INS*, 813 F.2d 1432, 1434-35 (9th Cir. 1987), overruled on other grounds by *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996) (en banc); *see also* Memorandum from Phyllis Cover, Office of Int'l Affairs, to All INS Asylum Officers and HQASM Coordinators, *Considerations for Asylum Officers Adjudicating Asylum Claims from Women* 804 (May 26, 1995) ("Serious physical harm consistently has been held to constitute persecution. Rape and other forms of severe sexual violence clearly can fall within this rule.") (citation omitted). The IJ's notion that the rapes were motivated merely to sexually "gratif[y]" the attackers impermissibly relied on the myth that rape is about sex instead of domination and control. *See*

---

[5]We have cautioned against such reasoning, noting that "[t]he difficulty of determining motive in situations of general civil unrest should not . . . diminish the protections of asylum for persons who have been punished because of their actual or imputed political views." *Ndom v. Ashcroft*, 384 F.3d 743, 752 (9th Cir. 2004) (alteration in original) (citation omitted).

*Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1076 (9th Cir. 2004) (noting that "[r]ape is not about sex; it is about power and control") (alteration in original) (citation omitted); *Lazo-Majano*, 813 F.2d at 1434 (rejecting BIA's finding that the repeated rapes of the petitioner by an army sergeant were "strictly personal actions" not constituting persecution); *see also Note on Certain Aspects of Sexual Violence Against Refugee Women*, U.N. High Comm'r for Refugees ("UNHCR"), 44th Sess., at 7, U.N. Doc. A/AC.96/822 (1993) (stating that "sexual violence has also been used by armed forces, including insurgent groups, . . . as a means of intimidating a civilian population perceived to be in political opposition to the armed force in question"). The militia members' statements that Ali was "getting what [she] deserved" while they raped her evidences that their motivation for the rape was to send a savage message to Ali and other members of the Muuse Diriiye clan that they were no longer in political power.

Accordingly, we reverse the IJ's finding of no past persecution because any reasonable factfinder would be compelled to find that Ali has proved past persecution on account of two protected grounds: 1) her political opinion; and 2) her membership in a particular social group.

### 2.  Future Persecution

**[6]** Ali is presumed to have a well-founded fear of future persecution based on her credible testimony of past persecution. 8 C.F.R. § 1208.13(b)(1). Because we hold that Ali has established past persecution, the burden shifts to the Department of Homeland Security ("DHS") to rebut the presumption that Ali is eligible for asylum.[6] *Id.* One way the government may satisfy this burden is by showing by a preponderance of the evidence that there has been a "fundamental change in cir-

---

[6]On March 1, 2003, the INS was abolished as an agency within the Department of Justice and its functions were transferred to the newly created DHS.

cumstances," such that Ali and her sons no longer have a well-founded fear of persecution, or that they could "avoid future persecution by relocating to another part of [Somalia], and under all the circumstances, it would be reasonable to expect [them] to do so." *Id*. § 1208.13(b)(1)(i)-(ii); *see also Ochave*, 254 F.3d at 868 n.5.

In *INS v. Ventura*, the Supreme Court held that we cannot determine the issue of changed country conditions in the first instance. 537 U.S. 12, 14 (2002). The holding of *Ventura* does not apply here. In *Ventura*, the BIA reviewed de novo the IJ's findings denying petitioner's asylum claim based on a failure to show past persecution and, in the alternative, based on changed country conditions. *Id*. at 14-15. On review, the BIA explicitly refused to address the question of changed country conditions. *Id*. at 15. Here, the BIA employed its streamlining procedures to affirm the IJ's decision without opinion. Therefore, the IJ's decision becomes the final agency decision subject to review, and the BIA forfeits its right to entertain the question of changed country conditions in the first instance. *See Guo v. Ashcroft*, 361 F.3d 1194, 1204 (9th Cir. 2004) (holding that the IJ's alternative holding that petitioner failed to establish past persecution, even if his testimony was credible, obviated the need for remand when the BIA affirmed without opinion). Because the IJ considered the issue of changed circumstances, we need not remand on this issue.

In his decision, the IJ found that "the conditions [in Somalia] have improved vastly since 1991, the civil war is over, thousands of refugees have returned." Although he cautioned that "the country is still somewhat unstable, there is a considerable account [sic] of crime and lawlessness in certain areas," he concluded that "there is no indication that the Midgans are being targeted, there is no genocide or imprisonment of Midgans." To rebut the presumption of a well-founded fear, the DHS must show how changed circumstances "will affect the specific petitioner's situation. . . . Information about general changes in the country is not sufficient." *Del Carmen*

*Molina v. INS*, 170 F.3d 1247, 1250 (9th Cir. 1999) (citation omitted). The only information specific to Ali that the IJ cites is that there is no evidence of "genocide or imprisonment" of members of her clan. The IJ fails to discuss both the persecution that Ali experienced on account of her political opinion, and whether the circumstances have changed such that she no longer needs to fear retaliation from the armed political groups currently struggling for power and opposed to the former regime.

The IJ seems to find support for his conclusion that the situation in Somalia has changed in the State Department's 1996 report on country conditions in Somalia, which was entered as evidence in this case. In actuality, this report provides more evidence to support than to rebut Ali's well-founded fear of persecution. Notably absent from the IJ's opinion is the report's finding that the Muuse Diriiye and other caste minorities "who had visibly supported the old regime were vulnerable to retaliation," often by the USC. *State Dep't Report* at 14-15.[7] The last section of the Report concludes:

> [b]ecause of the continuing violent and chaotic situation in parts of Somalia and the present absence of any clear governmental authority, the fears expressed by most . . . Somali applicants of returning at this time are quite understandable and often credible. It is clear that a potentially dangerous situation exists in some parts of Somalia.[8]

---

[7]The closeness of the Ali family's ties to the former administration is also evidenced by the photo submitted into evidence of the former Vice President, Hussein Kulmia Afra, seated between Ali and Osman at their wedding.

[8]Another report, prepared by the UNHCR and also before the IJ, noted that serious fighting among rival clans and political groups continued in Mogadishu. This report also notes that "[m]embers of minority groups, [which would include Ali's family,] are subject to harassment, intimidation, and abuse by armed gunmen of all affiliations."

**[7]** We have repeatedly found that the DHS has not rebutted the presumption of a well-founded fear of persecution when evidence in country reports indicates that persecution similar to that experienced by the petitioner still exists. *See, e.g., Agbuya v. INS*, 241 F.3d 1224, 1231 (9th Cir. 2001); *Kataria v. INS*, 232 F.3d 1107, 1115 (9th Cir. 2000). This case is no different: the evidence in the relevant country report indicates that persecution of members of Siad Barre's former government, as well as members of low-caste clans, continues. Accordingly, the IJ erred when he found that the INS rebutted the presumption of a well-founded fear of persecution in an individualized manner.

*3.   Firm Resettlement*

**[8]** Despite our conclusion that Ali experienced past persecution on account of a protected ground and that the DHS failed to rebut her presumption of a well-founded fear of persecution if returned to Somalia, Ali is mandatorily ineligible for asylum if she was firmly resettled in Ethiopia prior to entering the United States. INA § 208(b)(2)(A)(vi), 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15.[9] The regulations limit the circumstances in which firm resettlement bars an otherwise meritorious asylum claim. The firm resettlement bar only operates when the asylum applicant "entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15. Even so, the regulations provide two exceptions when the asylum applicant has already been offered permanent residence in another country. *Id*.; *Andriasian v. INS*, 180 F.3d 1033, 1043 (9th Cir. 1999). An asylum applicant who

---

[9]Because Ali filed her application for asylum before April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-28, 110 Stat. 3009-3546 (Sept. 30, 1996), her case is governed by the regulatory firm resettlement bar in 8 C.F.R. § 208.13(c)(2)(i)(B) and defined in 8 C.F.R. § 208.15.

received an offer of permanent resettlement is not subject to the firm resettlement bar if: (1) settlement in the country of first asylum "was a necessary consequence of his or her flight from persecution" and the applicant remained in that country only long enough to arrange onward travel, and did not "establish significant ties in that country;" or (2) the conditions of the applicant's "residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled." 8 C.F.R. § 208.15. We hold, therefore, that the plain language and structure of the regulation requires that an asylum applicant be offered permanent resident status or its equivalent by the country of first asylum to be considered firmly resettled. *See Abdille v. Ashcroft*, 242 F.3d 477, 485 (3d Cir. 2001) (holding similarly that "[i]t is readily evident from the plain language of § 208.15 that the prime element in the firm resettlement inquiry is the existence *vel non* of 'an offer of permanent resident status, citizenship, or some other type of permanent resettlement.' ") (citation omitted).

In finding Ali firmly resettled, the IJ misapplied Ninth Circuit law. The IJ stated that *Cheo v. INS*, 162 F.3d 1227 (9th Cir. 1998), stands for the proposition that "where an individual resides for a number of years in a third country without being bothered it is appropriate to presume firm resettlement." This interpretation is incorrect. In *Cheo*, we held that "*in the absence of evidence to the contrary*" the applicants' three-year residence in Malaysia triggered a presumption of firm resettlement and shifted the burden to the asylum applicant to show that they received no offer of permanent residence from Malaysia during that time. *Id.* at 1229 (emphasis added). Because the Cheos failed to present such evidence, the court found them firmly resettled. *Id.*

At first blush, Ali's five-year residence in Ethiopia seems to trigger the *Cheo* presumption, but this would require us to discount Ali's direct testimony, which the IJ found credible, that she never received an offer of permanent residence. The

IJ did just that when he concluded that "it is appropriate to presume that [Ali] was firmly resettled." This finding ignores *Cheo*'s critical limit: the presumption only applies when "there is no direct evidence one way or the other as to whether the [asylum applicants] have or had the right" of permanent resettlement in their country of first asylum. *Id*.; *see also Camposeco-Montejo v. Ashcroft*, 384 F.3d 814, 819 (9th Cir. 2004). When, as here, the applicant presented evidence that she never had a right to remain permanently in Ethiopia, the presumption never arises.

We have held that an offer of temporary residence does not compel a finding of firm resettlement. *See Camposeco-Montejo*, 384 F.3d at 819-20; *Cheo*, 162 F.3d at 1230. The plain language of the regulation requires an offer of permanent residence. Similarly, the fact that Ali fortuitously evaded detection by the government while living illegally in Ethiopia does not allow for a finding that Ali was firmly resettled in Ethiopia. We adopt the reasoning of the Third Circuit in *Abdille* when it stated: "Absent some government dispensation, an immigrant who surreptitiously enters a nation without its authorization cannot obtain official resident status no matter his length of stay, his intent, or the extent of the familial and economic connections he develops. Citizenship or permanent residency cannot be gained through adverse possession." *Abdille*, 242 F.3d at 487. Finally, we have also cautioned that the *Cheo* presumption "does not mean that as soon as a person has come to rest at a country other than the country of danger, he cannot get asylum in the United States." *Cheo*, 162 F.3d at 1230. Such narrow interpretation of the firm resettlement bar would limit asylum to refugees from nations contiguous to the United States or to those wealthy enough to afford to fly here in search of refuge. The international obligation our nation agreed to share when we enacted the Refugee Convention into law knows no such limits. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (codified as amended in scattered sections of 8 U.S.C.).

**[9]** For these reasons, we reverse the IJ's finding that Ali was firmly resettled in Ethiopia prior to entering the United States. We hold that Ali never received an offer of permanent residence as required by federal regulation to establish firm resettlement. Therefore, we hold that Ali is entitled to asylum. We remand for the Attorney General to exercise his discretion as to whether to grant that relief.

*B.   The Withholding of Removal Claim*

**[10]** The IJ held that Ali had failed to establish eligibility for asylum and, therefore, assumed that she could not meet the higher standard of proof needed for relief under withholding of removal. Because we hold that Ali is statutorily eligible for asylum, we remand to the IJ to determine in the first instance whether Ali and her sons have established eligibility for withholding of removal. *See He v. Ashcroft*, 328 F.3d 593, 604 (2003) (holding that petitioner established statutory eligibility for asylum, but remanding for consideration of petitioner's withholding of removal claim).

While the grant of asylum is discretionary, withholding of removal is mandatory if the petitioner establishes that upon removal from the United States her "life or freedom would be threatened" on account of one of the five protected grounds. INA § 241(b)(3)(A); 8 U.S.C. § 1231(b)(3)(A). The standard of proof required to establish eligibility for withholding of removal is higher than the standard for establishing eligibility for asylum. *Compare INS v. Stevic*, 467 U.S. 407 (1984) ("clear probability" standard under former withholding statute) *with INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (asylum standard).

**[11]** A finding of past persecution gives rise to a presumption of withholding of removal. 8 C.F.R. § 1208.16(b)(1)(i); *Mihalev*, 388 F.3d at 731; *Hoque v. Ashcroft*, 367 F.3d 1190, 1198 (9th Cir. 2004) (citing *Baballah v. Ashcroft*, 335 F.3d 981, 991 (9th Cir. 2003). Because we have held that Ali estab-

lished past persecution, we remand this case and instruct the BIA to consider Ali's and her sons' withholding of removal claims in light of this presumption.

## C.  The CAT Claim

**[12]** To obtain relief under the CAT, an applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The IJ concluded that Ali failed to establish that if returned to Somalia she would be tortured by the government or someone acting at the instigation or acquiescence of the government. *See* 8 C.F.R. § 1208.18(a)(1) (defining torture for the purposes of the CAT); *Zheng v. Ashcroft*, 332 F.3d 1186, 1194-97 (9th Cir. 2003) (interpreting this definition). Ali and her sons have not presented evidence that compels any reasonable fact-finder to determine that the IJ erred in denying them relief under the CAT. Accordingly, we affirm the IJ's determination that they are ineligible for relief under the CAT.

## IV.  Conclusion

In conclusion, we find that Ali established statutory eligibility for asylum. Because Ali did not receive an offer of permanent residence—or its equivalent—while in Ethiopia, she was not firmly resettled prior to her entrance into the United States. Since we find that Ali has established past persecution even under the higher standard required for withholding of removal, a presumption operates regarding her ability to show future threats to her life or freedom. We remand to the IJ to exercise its discretion on the asylum claim and for further consideration of Ali's and her sons' withholding of removal claims. We affirm the IJ's denial of Ali's application for relief under the CAT.

**PETITION GRANTED in part, REMANDED in part, and REVERSED in part.**