O’SCANNLAIN, Circuit Judge,
with whom KLEINFELD, RAWLINSON, and CALLAHAN, Circuit Judges, join, concurring in part and dissenting in part:
While I agree that a remand to consider changed circumstances in Fiji is warranted with respect to the Maharajs’ request for withholding of removal, I must respectfully dissent from the court’s holding with respect to the merits of the Maharajs’ asylum petition. I believe the Immigration Judge (“IJ”) properly concluded that the Maharajs had been firmly resettled in Canada. In my view, the opinion of the court misconstrues the law of resettlement, opens our asylum process to an alien who is not fleeing from persecution, and invites abusive country-shopping.
I
The Maharajs fled Fiji in 1987, having experienced substantial persecution, see Maj. Op. at 964-65, on account of their Indo-Fijian ethnicity. The family settled in Canada, where it sought refugee status and applied for asylum. The Maharajs lived undisturbed, legally and openly, in Canada for four years, during which time Mr. Maharaj worked as a fulltime janitor and bakery deliveryman, while Mrs. Maha-raj received training to become a nurse’s assistant and worked full-time caring for the elderly. The Maharajs rented an apartment, sent their children to free public school, and received free government-provided health care. Both Mr. and Mrs. Maharaj received Social Insurance Numbers and work authorization. Though the Maharajs disliked working menial jobs and felt that there was stigma attached to their status as refugees, they worshiped freely at a Hindu temple and developed friendships with non-Indians and non-Fijians in Canada.
The Immigration Judge (“IJ”) concluded that the Maharajs lived free from persecution in Canada; indeed, it is undisputed that while living there, the Maharajs enjoyed the stability, freedom, and safety offered to Canadian immigrants. Yet the Maharajs, dissatisfied with the vocational opportunities in Canada, crossed the border into the United States. Mr. Maharaj explained that he “wanted to move to United States because, uh, [he] wanted to see what United States looks like” and that the “main thing was job. We never had a good job.” Mrs. Maharaj testified that “we were not getting good job .... We wanted to, you know, go up and have more money and build ourself. So, that’s the time when we thought we don’t like Canada.” When they arrived, they “liked this place much better than Canada, so [they] decided to stay here.”
Once in the United States, the Maharajs overstayed the six month window permitted to visitors, and were served with Orders to Show Cause, charging them with deportability. The family conceded de-portability, but requested asylum and withholding of removal. After hearing Mr. and Mrs. Maharajs’ testimony, the IJ concluded that although Canada has a refugee program similar to that of the United States, the Maharajs voluntarily chose to leave Canada before Canadian authorities reviewed their petition. Indeed, when asked whether “it’s possible that you could have refugee status in Canada and not even know it,” Mr. Maharaj answered, “Could be.”[1]
*980 The IJ concluded that the Maharajs “never were actually granted refugee status, but it clearly was offered them. They just chose not to take advantage of it, or not wait until it was offered them, or until there was a final resolution of the problem.” Because the IJ concluded that the Maharajs had been firmly resettled in Canada, the IJ, in my view quite properly, denied asylum because of statutory ineligibility. See 8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15. The IJ also denied the Maharajs’ request for withholding of removal on the grounds of changed circumstances in Fiji, which we are, quite properly, remanding to the IJ.
II
Here the IJ concluded that — given the circumstances of the Maharajs’ four-year sojourn in Canada — the Maharajs had been firmly resettled despite a concession by the government that the Maharajs’ pending application for asylum there had not yet been authoritatively resolved. I suggest that in reversing the IJ’s legal conclusion, the majority misreads the firm resettlement regulation in two respects. First, it too narrowly construes the catchall provision. Second, it ignores the history and purpose of the regulation by improperly reading the list of factors which the IJ can apply in determining “firm resettlement” as exhaustive.
A
The plain text of §§ 208.15 and 208.13 allow the IJ significant latitude for finding that an alien “has been firmly resettled” based not only on “offers” of permanent resident status or citizenship, but also on the basis of “some other type of permanent resettlement.” The phrase “some other type of permanent resettlement” must be read in the context of the preceding examples. See, e.g., Circuit City Stores v. Adams, 532 U.S. 105, 114-115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (“ ‘[Wjhere general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.’ ” (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991))). Here the preceding objects — “permanent resident status” and “citizenship” — are non-temporary classifications which, if granted by a third country, relieve the fear of persecution in the native country. Similarly, “some other type of permanent resettlement” can include informal understandings, as might be seen in less developed immigration systems, as the majority concedes, but need not necessarily be so limited. Rather, the phrase could also encompass others types of “permanent resettlement” short of full citizenship, so long as circumstances of the arrangement are such that the alien is not at risk of being deported back to his native country.
Moreover, the regulation by its plain text does not require that the alien actually receive permanent resident status, citizenship, or some other type of permanent resettlement; rather, it only requires an “offer ” of such. Thus, while “some other type of permanent resettlement” is a minimal requirement in itself, the regulations require even less: only a mere offer. The regulation’s focus on an “offer" rather than on receipt of “some other type of permanent resettlement” underscores that the resettlement question turns on whether the alien remains in fear of being returned to persecution in his native country. *981 The text of the regulation clearly empowers the IJ to make just such an inquiry.
Under these circumstances, I would conclude that the Maharajs fall into such category: they were offered, and had accepted, the ongoing protection of the Canadian government while it processed their asylum application. Though that protection may at some point culminate in a formal “offer” of citizenship or other status, when the IJ evaluated the Maharajs’ claim there was nothing to indicate that they would not be allowed permanently to resettle in Canada. Indeed, the IJ reasonably determined that the Maharajs were not just offered temporary resident status; rather, they were offered, and accepted, indefinite resettlement. The difference is crucial. While temporary status, by definition, entails a definitive ending point — and therefore necessarily means that the immigrant will be in flight again — indefinite resettlement does not create such worries. Here, the Maharajs’ asylum and refugee applications were pending with the Canadian government. Until such time as the Canadian government acted on the applications, the Maharajs were free- to remain in Canada. This arrangement, which is not temporary, qualifies under the regulatory definition and the IJ could properly so find. Simply, the lack of a formal “offer” is not disposi-tive where the conditions of the aliens’ stay are such that there was no risk of deportation when they chose to leave.[2]
B
Í
To parse the regulation in more detail, § 208.15 states that “An alien is considered to be firmly resettled if .... [he or she has] received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement.” While the regulation plainly provides that a finding of an “offer” of permanent resident status, citizenship, or some other type of permanent resettlement automatically and conclusively bars the alien from applying for asylum, the regulation does not state that only such a showing establishes firm resettlement. Rather, because the regulation is not limited, other factors- — for example, the length of the alien’s stay in the safe third country, the alien’s work history in the safe third country, or the alien’s ability to take advantage of the safe third country’s social services — may inform the IJ’s firm resettlement analysis.[3] These factors, however, are discretionary and do not necessarily disqualify the asylum applicant.[4]
*982 This interpretation fits with the purpose of the Refugee Act: to help those fleeing persecution. As the facts of this case show, it is not only those who have been offered permanent resettlement that are no longer fleeing persecution. The Maha-rajs did not receive a formal “offer” of permanent resettlement; yet, considering the circumstances of their stay, it is clear that they were not fleeing persecution. Over the course of four years, Mr. and Mrs. Maharaj were employed and received social services in the form of health care and education. On the basis of these factors, the IJ rightly determined that the Maharajs had firmly resettled in Canada.
2
The focus of the firm resettlement analysis has always been — and remains— whether the refugee remains in flight. Thus, the regulation requires that the adjudicator consider whether there is an “offer” of permanent resettlement as a means of determining whether the refugee remains in flight; however, the regulation still entertains other means of determining whether the refugee is fleeing persecution.
Such interpretation is the only one consistent with the Supreme Court’s sole discussion of firm resettlement. In 1971, the Court considered the case of Yee Chien Woo, a native of.Red China who had fled for Hong Kong in 1953, where he lived until 1960, when he moved to the United States. See Rosenberg v. Yee Chien Woo, 402 U.S. 49, 50, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971). Considering the 1957 extension of the Refugee Relief Act, which omitted reference to “firm resettlement,” the Court held that the firm resettlement doctrine still persisted in the new definition of “refugee” because “both the terms ‘firmly resettled’ and ‘fled’ are closely related to the central theme of all 23 years of refugee legislation — the creation of a haven for the world’s homeless people.” Id. at 55, 91 S.Ct. 1312. The Court explained that:
[The act] was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives. Nor could Congress *983 have intended to make refugees in flight from persecution compete with all of the world’s resettled refugees for the 10,200 entries and permits afforded each year under [the statute]. Such an interpretation would subvert the lofty goals embodied in the whole pattern .of our refugee legislation.
Id. at 56, 91 S.Ct. 1312. The Court also announced that “the correct legal’ standard” to apply in cases where a petitioner has fled persecution is that the petitioner’s “physical presence [in the United States] must be one which is reasonably proximate to the flight and not one following a flight remote in point of time or interrupted by intervening residence in a third country reasonably constituting a termination of the original flight in search of refuge.” Id. at 56-57, 91 S.Ct. 1312 (internal quotation marks omitted and emphasis added).
In adopting the 1990 amendments, the INS intended to recognize the importance of the existence of an “offer” to analyzing firm resettlement.[5] I would not, however, take an unwarranted additional step and conclude that the INS intended to make the existence vel non of an “offer” for permanent resettlement the exclusive sine qua non of the refugee analysis. The Supreme Court’s guidance in Woo should not be ignored; “firm resettlement” must still be understood with an eye towards overall refugee policy, whose “central theme” is related to the concepts “firmly resettled” and “fled.” Id. at 55, 91 S.Ct. 1312.
The Supreme Court’s exegesis of “firm resettlement” in Woo is consistent with both the origins of, and the continuing rationale supporting, our refugee and asylum laws. The original congressional declaration of policies and objectives for the Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), recognized that
it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands.... The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.
Refugee Act § 101.
Of course, a consequence of the international and cooperative nature of our obligations under the Refugee Act is that our obligations, by practical necessity, became limited. The most obvious limitations are the discretion bestowed on the Attorney General to accept or to reject the asylum application of a qualified refugee, see 8 U.S.C. § 1158(b)(1), and the numerical ceiling on the number of refugees that may be admitted into the United States each year, see 8 U.S.C. § 1157(a). These limitations are consistent with the Court’s observation in Woo that “refugees in flight from *984 persecution” should not be forced to compete with “the world’s settled refugees,” 402 U.S. at 56, 91 S.Ct. 1312, for the finite number of places available in the United States each year. Further, these limitations underscore the importance of our task: Our refugee system is intended for those in flight, and in need of a safe harbor; in contrast, immigrants who voluntarily choose to abandon a perfectly safe haven may be abusing the generosity of the Refugee Act.[6]
We must consider these policy goals and limitations as part of a proper interpretation of § 208.15. I cannot support an interpretation of the regulations which constricts the analysis to only a single element, when the text of the regulations, their purpose, and Supreme Court precedent point to a broader construction.
3
Under our own case law, we long ago jettisoned the notion that § 208.15 requires an analysis exclusively aimed at the existence of an “offer.” In our seminal case on the subject, Cheo v. INS, 162 F.3d 1227 (9th Cir.1998), Meng Ly Cheo and Meng Heng Cheo, Cambodian nationals, fled to Vietnam and thence to Thailand, where they stayed for three years before entering the United States through Mexico. Id. at 1228. We concluded, however, that:
Three years of peaceful residence established that the ground of “firm resettlement” in Malaysia might apply, so the Cheos had the burden of proving that they were not firmly resettled. That was enough time so that, in the absence of evidence to the contrary, it would be a reasonable inference from the duration that Malaysia allowed the Cheos to stay indefinitely. A duration of residence in a third country sufficient to support an inference of permanent resettlement in the absence of evidence to the contrary shifts the burden of proving absence of firm resettlement to the applicant.
Id. at 1229 (emphasis added) (citing Abdalla v. INS, 43 F.3d 1397, 1399 (10th Cir.1994), and Chinese Am. Civic Council v. Attorney General, 185 U.S.App. D.C. 1, 566 F.2d 321, 328 n. 18 (D.C.Cir.1977)). We did not state that the Cheo presumption requires an immigrant prove that he or she has “not received an offer,” but rightly required the immigrant prove that he or she is “not firmly resettled.” Critically, therefore, Cheo concluded that other facts besides the existence of an “offer” can show firm resettlement.[7]
Our later case law applying Cheo is consistent with a broader reading of the regulation. In Andriasian v. INS, 180 F.3d 1033 (9th Cir.1999), the petitioner fled Azerbaijan with his family, escaping to Armenia. Id. at 1036. The family moved between Russia, Armenia, and the Ukraine, nine times over the next forty-four months, though the petitioner testified that the family did not report any substantial *985 problems living in Armenia. Id. at 1039. On this basis, the IJ concluded that the petitioner firmly resettled in Armenia. We reversed, concluding that firm resettlement “precludes asylum, unless the application can demonstrate that his stay in the third country lasted only until he could arrange for further travel or that the conditions of life in that country would be unduly restrictive.” Id. at 1043. This in no way precludes the consideration of additional factors to determine whether the petitioner has firmly resettled. Indeed, Andriasian is consistent with Woo’s explanation that:
many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way. Such stops do not necessarily mean that the refugee’s aim to reach these shores has in any sense been abandoned. ... The presence of such persons in this country is not “one which is reasonably proximate to the flight” or is “remote in point of time or interrupted by intervening residence in a third country.”
402 U.S. at 57 n. 6, 91 S.Ct. 1312. Unlike the Supreme Court’s warning in Woo, or the meanderings in Andriasian itself, the Maharajs stayed in Canada — -and Canada alone — for four years. It is clear from these facts that Canada was not a mere stopover; it was the destination in which they first intended to resettle and did so.[8]
In sum, our prior case law, in accordance with the language of the regulation, allowed consideration of a variety of factors to show firm resettlement. Cheo properly put the focus of the analysis on “firm resettlement,” rather than on the existence vel non of an “offer” for permanent resettlement. Again, based on our precedent, the history, text, and structure of the regulation, and Supreme Court precedent, I cannot agree that the regulation requires exclusive focus on one factor; rather, the existence of an “offer” is one means of proving firm resettlement — and is determinative if shown — but it is not the exclusive means of proving firm resettlement.
C
Under a proper reading of the regulations, a variety of factors may be considered as part of the analysis of firm resettlement. If the petitioner has been offered permanent resident status, citizenship, or another type of permanent resettlement, then “firm resettlement” is established and the asylum petition must be denied, unless the petitioner establishes that one of the two exceptions provided at § 208.15(a)-(b) apply. However, if no “offer” of permanent resident status, citizenship, or other *986 type of permanent resettlement is made, the IJ may still consider the facts of the case to determine whether the totality of the circumstances indicate that the petitioner had firmly resettled in the third country. This interpretation fits with the broader asylum policy, and the concept that asylum is for those in need. See Sall v. Gonzales, 437 F.3d 229, 233 (2d Cir.2006) (per curiam) (noting that “the underlying purpose of asylum regulations — to provide refuge to desperate refugees who reach our shores with nowhere else to turn — accords with reserving the grant of asylum for those applicants without alternative places of refuge abroad”); see also id. (noting that while aliens physically present in the United States are generally allowed to apply for asylum, 8 U.S.C. § 1158(a)(2)(A) exempts any alien who could be removed to a “[s]afe third country”).
Applying such construct to the facts of this case, the IJ rightly denied the asylum petition. The facts overwhelmingly indicate that the petitioners had firmly resettled in Canada: the Maharajs had jobs and received job training, enjoyed free health care and education, experienced no substantial discrimination, and appeared to enjoy a relatively peaceful existence. Thus, the IJ had the authority to conclude that the Maharajs had been firmly resettled in Canada. Having so concluded, the IJ rightly determined that neither of the exceptions in § 208.15(a)-(b) applied, and therefore the firm resettlement bar required the denial of the asylum petition. Simply, “[t]he United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn.” Id. I would, therefore, deny the petition for review.
Ill
I agree with the majority that there is a split of authority among the circuit courts of appeals; regrettably, the majority follows the weaker line of the Third and Seventh Circuits, rather than the more persuasive view of the Second, Fourth, Eighth, and D.C. Circuits. In Second Circuit’s opinion in Sall v. Gonzales — the most recent discussion of this issue — the petitioner was a native and citizen of Mauritania who fled to Senegal. 437 F.3d at 231. Sail stayed in a Red Cross camp for four-and-one-half years, then moved to the capital of Senegal, Dakar, where he stayed for another nine months before paying for transportation to the United States. Id. The IJ concluded that Sail was ineligible for asylum because he had firmly resettled in Senegal, having lived there for approximately five years with no impediments to work or travel. Id. at 232. On review, the Second Circuit reviewed the IJ’s conclusion with an eye toward the purpose of the asylum regulations: “to provide refuge to desperate refugees who reach our shores with nowhere else to turn.” Id. at 233. Thus, it was proper to “reserv[e] the grant of asylum for those applicants without alternative places of refuge abroad, regardless of whether a formal ‘offer’ of permanent settlerhent has been received.” Id. (emphasis added).
Turning to the text of the regulations, the Second Circuit rightly noted that while “the regulation places particular importance on the presence vel non of an actual “offer” of permanent resident status,” the “language of the regulation ... requires an IJ to examine the specific circumstances of an applicant’s case to decide whether he has firmly resettled in a third country.” Id. Thus, Sail instructed the IJ to
consider the totality of the circumstances, including whether Sail intended to settle in Senegal when he arrived there, whether he has family ties there, whether he has business or property connections that connote permanence, *987 and whether he enjoyed the legal rights — such as the right to work and to enter and leave the country at will — that permanently settled persons can expect to have. Of particular importance is whether he received an offer of permanent resident status.
Id. at 235.
Here, the facts show that the Maharajs intended to settle in Canada, that they have family ties to Canada, that they were employed in Canada, that they have permanent (or at least non-temporary) housing in Canada, and that they enjoyed rights and privileges commensurate with Canadian citizens. I agree with Sail’s statement that an “offer” of permanent resident status is “of particular importance”; however, the Second Circuit is also correct that this inquiry is not a sine qua non of a firm resettlement analysis.
Under facts virtually indistinguishable from those presented here, the Eighth Circuit considered the case of an Iranian native and citizen who fled to Spain. Farbakhsh v. INS, 20 F.3d 877 (8th Cir.1994). Shortly after arriving in Spain, the petitioner “filed an application for refugee status in Spain.” Id. at 880. Farbakhsh stayed in Spain for almost four years, though he “did not have official permission to work or study in Spain.” Id. When the petitioner left, his application for refugee status was still pending. Id. Nevertheless, the IJ concluded, and the BIA agreed, that the petitioner “had ‘firmly resettled’ in Spain and was no longer fleeing persecution when he entered the United States.” Id.
On review, the Eighth Circuit concluded: We hold the record supports the Board’s finding that petitioner had firmly resettled in Spain. Petitioner had lived more than four years in Spain without fear of being returned to Iran; he initially intended to remain in Spain because he filed an application for refugee status there; his application for refugee status was pending; his younger brother and younger sister were living in Spain. Moreover, petitioner’s travels do not suggest that his arrival in the United States in 1987 was reasonably proximate to his flight from persecution in Iran in 1982.
20 F.3d at 882.
In short, the “firm resettlement” bar prohibited consideration of Farbakhsh’s asylum application, even though he had not received an “offer” of permanent resettlement from Spain. The Eighth Circuit rightly concluded that an asylum application, coupled with an undisturbed and lengthy stay in the third country, was sufficient to bar the application at the IJ’s discretion (as opposed to a finding of firm resettlement, which mandates denial of the application). See also Chinese American Civic Council v. Attorney General, 566 F.2d 321 (D.C.Cir.1977) (noting that “[a]p-pellants did not present any facts to rebut the normal conclusion from such extended residence that appellants were firmly resettled and no longer in flight” and citing Woo, 402 U.S. at 49, 91 S.Ct. 1312, for support).
The Eighth Circuit recently reiterated this view in Rife v. Ashcroft, 374 F.3d 606 (8th Cir.2004):
We agree with the Third Circuit in Ab-dille that the text of 8 C.F.R. § 208.15 makes [an offer of permanent resettlement] an important factor and, indeed, the proper place to begin the firm resettlement analysis. But in some cases it will not be dispositive. For example, in our only decision resolving a firm resettlement issue, we affirmed the BIA’s determination that the alien’s four-year stay in Spain constituted firm resettlement even though his application for *988 refugee status in Spain was still pending when he came to the United States.[9]
Id. at 611. I agree, along with the Eighth Circuit, that an “offer” of permanent resettlement is “the proper place to begin the firm resettlement analysis”; the majority here errs by claiming that an “offer” of permanent resettlement is the proper place to end the firm resettlement analysis.
The Fourth Circuit adopted a similar approach. In Mussie v. INS, 172 F.3d 329 (4th Cir.1999), the petitioner was a native and citizen of Ethiopia who fled to Germany. Id. at 330. Mussie applied for, and was granted, asylum in Germany, though the record did not disclose whether she received permanent resident status. Id. Mussie received government-paid language schooling, and monetary assistance for transportation, rent, and food. Id. at 330-31. With some relatively minor exceptions, Mussie lived peacefully in Germany for approximately six years. Id. at 331.
On review, the Fourth Circuit noted that although “the record is silent as to whether Mussie actually received a formal “offer” of permanent residency in Germany, the INS introduced sufficient ‘evidence indicating’ that Mussie had received at least an offer of ‘some other type of permanent resettlement’ in Germany, thereby meeting its evidentiary burden.” Id. at 331 (quoting § 208.15). Supporting this conclusion, Mussie noted that the petitioner “received government assistance for language schooling, transportation, rent, and food; held a job; paid taxes; and rented her own apartment.” Id. at 332.
Similarly here, the Maharajs received a variety of government benefits, including free health care and schooling, held jobs, and rented an apartment. Unlike Mussie, file Maharajs’ asylum petition was still pending when they chose to leave Canada; yet, the evidence indicated that the Maha-rajs and the Canadian government were in stasis, much like the relationship between Mussie and the German government. While both the Maharajs and Mussie had something less than an explicit “offer” of permanent resettlement, the facts and circumstances surrounding their lives in Canada and Germany, respectively, indicate that an IJ could have reasonably concluded that both had established an “other type of permanent resettlement.”
In sum, other Circuits have rejected the improperly narrow reading of the regulations promulgated by the majority. Moreover, several Circuits have done so recently, belying the majority’s claim that the 1990 amendments to the regulations dramatically altered the “firm resettlement” analysis.
IV
I am also persuaded that public policy concerns reinforce the IJ’s interpretation here. The majority’s analysis will open the door to rampant country-shopping, a result that our immigration laws have long sought to avoid. See, e.g., Kalubi v. Ashcroft, 364 F.3d 1134, 1140 (9th Cir.2004) (noting that “[i]n an appropriate case, ‘forum shopping’ might conceivably be part of the totality of circumstances that sheds light on a request for asylum in this country”); Susan F. Martin and Andrew I. Schoenholtz, Asylum in Practice: Successes, Failures, and the Challenges Ahead, 14 Geo. Immigr. L.J. 589, 606 (noting that “[mjost advanced Western nations have adopted the principle in their asylum laws that the first safe haven country to which a *989 refugee flees should be the one in which he or she seeks asylum” in order to reduce “asylum-shopping”). Indeed, the facts of this case demonstrate the likely effect of the majority’s narrow reading of § 208.15. The Maharajs lived peacefully in Canada for four years, enjoying that country’s social and economic benefits. Dissatisfied with life in Canada — rather than with life in Fiji — the Maharajs decided to move to the United States. What a blatant abuse of the refugee and asylum system! It is undisputed that the Maharajs were no longer fleeing from persecution when they came to the United States. By their own admission, they were merely dissatisfied with their job prospects in Canada. While the desire to enjoy improved economic circumstances may motivate many immigrants, it is emphatically not a reasonable or a proper basis for granting an asylum petition.
Indeed, the Maharajs — who apparently immigrated for economic gain — may not be the worst example. Nothing in the majority opinion prevents an immigrant who flees his native country, settles into a new third country, lives there legally (under any status short of a formal “offer” of permanent resettlement), enjoys peace and prosperity in the third country for many years, then, having decided that the grass is greener in the United States, immigrates here. Such a hypothetical immigrant could apply for asylum — a system intended “to respond to the urgent needs of persons subject to persecution in their homelands,” Refugee Act § 101 (emphasis added) — and the firm resettlement bar, amazingly, would not apply. Considering our hypothetical immigrant, who could be further from the platonic refugee? This immigrant enjoys safety, prosperity, and security offered by the third country, and the immigrant’s move is motivated by economics rather than fear. Yet the majority is willing to reward him by allowing the asylum petition to proceed.
I would add that country-shopping is particularly egregious where, as here, the petitioner has an asylum petition pending in another safe third country when he arrives here. These petitioners may be seeking better economic opportunities or may be attempting to game the immigration law system, but what is certain, is that these petitioners do not need the asylum in the United States to protect them from persecution. Given that the Refugee Act allows the granting of only a limited number of asylum petitions, and is intended to respond to the dire and urgent needs of a deserving group of people, the effect of the majority’s unnecessarily narrow reading of § 208.15 is most problematic.
What’s more, let’s not lose sight of the forest for the trees. The likely effect of the majority opinion will be to increase greatly the government’s burden in asylum cases. Once the alien denies having received a formal offer, the burden shifts to the government to prove that the alien did receive some sort of offer. However, the circumstantial evidence which the Department of Homeland Security (“DHS”) typically uses to prove an asylum case will be largely useless. This case is a perfect example of the difficulty DHS will face in future asylum proceedings: During their hearing, the Maharajs admitted to living a perfectly happy life in Canada; yet the circumstances of their stay, under the majority construct, may only be used to show whether or not the Maharajs received an “offer.” If the evidence shows that they did not receive an offer, any other evidence — even if patently and obviously probative — is automatically disregarded. Simply, the majority’s construct will hamstring DHS to an intolerable and unreasonable degree in future asylum proceedings.
V
The Maharajs emigrated from Canada, where they had lived peacefully for four *990 years, not from Fiji, where they were persecuted. The majority’s unnecessarily narrow reading of “firm resettlement” — focusing exclusively on an “offer” — ignores the Supreme Court’s guidance on how to interpret our asylum laws. As a result, the majority opinion puts us on the wrong side of a circuit split and invites blatant country-shopping. I respectfully dissent.

. The INS attorney and Mr. Maharaj had the following dialogue:
Q. Have you at anytime after you've left Canada attempted to find out what the decision on your asylum application was in Canada?
A. No.
*980 Q. You don’t know what status you are in? You don’t know if it was denied? You don’t know if it was granted?
A. No, I don't.
Q. So, it's possible that you could have refugee status in Canada and not even know it?
A. Could be.

. In any event, there is a certain irony to the majority’s holding, under these circumstances, that the Maharajs never received an "offer” of permanent resettlement. It was, after all, the Maharajs’ voluntary choice to abandon prematurely their asylum application in Canada.

. The majority suggests that we misread "offer of” for "offer or." Maj. Op. at 975. While we agree, of course, with the majority that the mandatory bar applies if the alien receives "an offer of permanent resident status, citizenship, or some other type of permanent resettlement,” § 208.15 (emphasis added), we do not agree that only such a showing will suffice. My analysis is not rooted in the substitution of "of” for "or,” but rather in the regulation’s plain lack of exclusivity.

.Even granting, as the majority concludes, that the existence vel non of an "offer” is a " ‘prime element in the firm resettlement inquiry,’ ” Maj. Op. at 973 (quoting Abdille v. Ashcroft, 242 F.3d 477, 485 (3d Cir.2001)) (emphasis added), such conclusion is insufficient to construe the regulation definitively. Rather, we must still consider whether, as the majority concludes, the existence vel non of an “offer” should be the exclusive element in the firm resettlement inquiry. Though the existence of an "offer” is the proper starting place when considering firm resettlement, according to the regulations, the existence of an "offer” is merely one (of many) methods of determining whether an immigrant has been firmly resettled. By reading the existence of an "offer” for permanent resettlement as precisely coextensive with "firm resettlement,” *982 the majority dramatically, unnecessarily, and wrongly decreases the universe of factors that can contribute to a finding of firm resettlement.
Indeed, by reading the "firm resettlement” as coextensive with receipt of an "offer” of permanent resettlement, the majority renders the phrase "firm resettlement” meaningless. If the regulations had intended to equate firm resettlement exactly with the existence of an "offer” for permanent resettlement, then why should the phrase "firm resettlement” appear in the regulations at all? Under the majority’s reading, § 208.13 (c)(2)(i)(B), which bars asylum applications for those "firmly resettled,” should bar asylum applications for those who have received an offer, and § 208.15 should then define an "offer of permanent resettlement.” That is not what the regulations say, though that is the effect of the majority’s interpretation. In my view, the text and structure of the regulations treat "firm resettlement” as a broader concept than the existence of an "offer.”
The majority contends, however, that this interpretation is inconsistent with the regulation, which "plainly contemplates that an alien may have 'entered' a third country with an offer of 'some other type of permanent resettlement^]' ” Maj. op. at 975. The majority is mistaken. The regulation states that "An alien is considered to be firmly resettled if ..he or she entered into another country with, or while in that country received an offer ...” § 208.15 (emphasis added). Plainly, some forms of permanent resettlement may be received on "entr[y]”; others, however, may be received later. This broad language in no way precludes — and, if anything, demands — an interpretation that allows for consideration of certain types of permanent resettlement that accrue over time. Simply, the regulation’s “or” phraseology clearly encompasses a variety of types of resettlement and the majority errs in giving a narrow reading to such plainly broad language.

. The majority relies heavily on 1990 amendments to the regulations, and discounts pre-1990 precedent. The majority concludes that “until October 1990 ... an alien’s resettlement elsewhere was only a factor to be considered by immigration judges, the BIA, and the courts in evaluating an asylum claim as a matter of discretion.” Maj. Op. at 968. After 1990, however, “the INS amended its regulations concerning firm resettlement, providing for a mandatory denial of asylum upon a finding of firm resettlement.” Abdille v. Ashcroft, 242 F.3d 477, 483 n. 4 (3d Cir.2001). However, even assuming, as the majority argues, that the amendments " 'deemphasiz[ed] the previously paramount question whether the refugee remains in flight,' ” and instead focused on " 'the actual existence vel non of an offer of permanent resettlement,’ ” Maj. Op. at 968-69 (quoting Robert D. Sloane, An ' Offer of Firm Resettlement, 36 Geo Wash. Int'l L. Rev. 47, 57 (2004)), that does not preclude the reality that the firm resettlement question — and the existence of an "offer” — is intertwined with the question of whether the refugee remains in flight.

. Not surprisingly, we have imported this policy objective into our case law. Most pertinently, in Yang v. INS, 79 F.3d 932 (9th Cir.1996), the applicants sought asylum from Laos, having spent fourteen unmolested years in France subsequent to fleeing Laos. Yang noted that the statute is aimed at "the urgent needs of persons subject to persecution in their homelands,” id. at 939, citing Refugee Act of 1980, § 101, and noted that persons firmly resettled elsewhere "are by definition no longer subject to persecution.” Id.

. Indeed, other Circuits have understood our precedents perfectly well. For example, the Seventh Circuit explicitly rejected Cheo and concluded that "the primary and most important inquiry in any analysis of firm resettlement is whether or not the stopover country has made some type of” offer "of permanent resettlement.” Diallo v. Ashcroft, 381 F.3d 687, 693-94 (7th Cir.2004) (explicitly rejecting Cheo); Firmansjah, 424 F.3d at 602 (same).

. Ali v. Ashcroft, 394 F.3d 780 (9th Cir.2005), to which the majority repeatedly cites, simply does not apply to the facts of this case. In Ali, the petitioner, a Somali refugee, spent five years in Ethiopia as an undocumented alien attempting to arrange travel to a safe third country that would offer her permanent resettlement. Ali, 394 F.3d at 783-84. Ali properly concluded that "the fact that Ali fortuitously evaded detection by the government while living illegally in Ethiopia does not allow for a finding that Ali was firmly resettled.” Id. at 790. In contrast, the Maha-rajs lived openly and freely in Canadian society. Ali, as an illegal, undocumented worker in an inhospitable environment was not similarly situated to the Maharajs.
For similar reasons, Camposeco-Montejo v. Ashcroft, 384 F.3d 814 (9th Cir.2004), is inapplicable. As we noted in that case, the petitioner "certainly did not experience in [the third country] the freedom and complete lack of 'molestation or persecution' that seemed to characterize the applicants’ stays in Cheo and Vang.” Id. at 820 (citing Cheo, 162 F.3d at 1228). Because of the various restrictions and difficulties suffered by that petitioner, his application would not be barred under § 208.15(b) regardless.

. As noted by the majority, Farbakhsh relied on In re Soleimani, 20 I. & N. Dec. 99, 104, 1989 WL 331872 (1989), which is arguably outdated. Yet, the Eighth Circuit’s pronouncement in Rife clearly treats Farbakhsh as precedential authority. Thus, despite the majority’s claims to the contrary, its analysis conflicts with the Eighth Circuit’s.